# EXHIBIT A

IN DISTRICT COURT, COUNTY OF GRAND FORKS, STATE OF NORTH DAKOTA

| | |
|---|---|
| Farmers Union Mutual Insurance Company, <br><br> Plaintiff, <br><br> vs. <br><br> Mesa Underwriters Specialty Insurance Company, <br><br> Defendant. | Case No.: _____ <br><br> **SUMMONS** <br><br> **RECEIVED** <br><br> AUG 1 3 2025 <br><br> Selective Insurance <br> Corporate Legal Department |

TO THE ABOVE NAMED DEFENDANT:

[1]    You are hereby summoned and required to appear and defend against the Complaint in this action, which is herewith served upon you, by serving upon the undersigned an Answer or other proper response within twenty-one (21) days after service of this Summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

Dated this 2 9th day of July, 2025.

William P. Harrie, ND ID#04411
Nilles Law Firm
1800 Radisson Tower
201 North Fifth Street
P.O. Box 2626
Fargo, ND 58108-2626
Phone: 701-237-5544
E-Mail: wharrie@nilleslaw.com
Attorneys for Plaintiff
Farmers Union Mutual Insurance Company

IN DISTRICT COURT, COUNTY OF GRAND FORKS, STATE OF NORTH DAKOTA RECEIVED

| | |
|---|---|
| Farmers Union Mutual Insurance Company, | AUG 1 3 2025 |
| Plaintiff, | Case No.: _____ Selective Insurance |
| | Corporate Legal Department |
| vs. | **COMPLAINT FOR** |
| | **DECLARATORY JUDGMENT** |
| Mesa Underwriters Specialty Insurance Company, | |
| Defendant. | |

The Plaintiff Farmers Union Mutual Insurance Company ("FUMIC"), for its Complaint for Declaratory Judgment against Defendant, alleges:

[1.]    This is a declaratory judgment brought pursuant to Chapter 32-23 of the North Dakota Century Code, to obtain a determination as to whether Mesa Underwriters Specialty Insurance Company ("MUSIC"), as the insurer of Edgewood Properties, LLLP and EVI McEnroe Apartments, LLC, has the primary obligation to defend and indemnify Dakota Commercial & Development Co. ("Dakota Commercial"), in the lawsuit entitled *Edgewood Properties, LLLP, EVI McEnroe Apartments, LLC; EVI Campus Place, LLC; and EVI Mandan Apartments, LLC, vs. Community Contractors, Inc.; Dakota Commercial & Development Co.; McEnroe Place, LLC #2; McEnroe Place, LLC #3; Village Real Estate, LLC, Campus Place Investments, LLC 6; CRT Investments, LLC; CRT Investments, LLC and Turning Point, LLC vs. Community Contractors, Inc. vs. A & L Siding and Home Improvement Center, Inc., and Remer Iron Works, Inc.*, an action venued in Grand Forks District Court, North Dakota ("Edgewood Lawsuit").

[2.]    The initial incident or occurrence giving rise to the Underlying Lawsuits occurred on June 8, 2019, following the collapse of a balcony on the fourth story of the apartment complex owned by EVI McEnroe, of which Edgewood REIT is the sole owner.

1

[3.]    A separate occurrence or occurrences gave rise to the Edgewood Lawsuit.  Edgewood alleges in its Amended Complaint that each of its six (6) Apartment Complexes, and particularly the balconies, were improperly designed and constructed and that Edgewood incurred remediation costs, diminution in value, lost rent, lost revenue, lost income and other damages and expenses in remediating the six (6) Apartment Complexes and their balconies.  Edgewood alleges in the Amended Complaint that Dakota Commercial was negligent regarding the development, design, construction, and management of the six (6) Apartment Complexes involved in the Edgewood Lawsuit, that resulting in building defects, a subsequent apartment balcony collapse, and remediation costs and expenses to repair and replace the defective balconies on all of the apartment buildings.  A copy of the Amended Complaint is attached as Exhibit 1.

[4.]    Edgewood Properties LLLP is the entity that owns EVI McEnroe and Edgewood REIT.

[5.]    Plaintiff Farmers Union Mutual Insurance Company ("FUMIC") is a mutual insurance company licensed to do to business in the State of North Dakota.

[6.]    At all material times, FUMIC insured Dakota Commercial & Development Co., under a comprehensive general liability insurance policy.

[7.]    The Edgewood Lawsuit include claims made against FUMIC insured Dakota Commercial & Development Co.   EVI McEnroe Apartments, LLC retained Dakota Commercial & Development Co. to manage the property located at 3880 Garden View Drive, Grand Forks, North Dakota 58208.  Additionally, Dakota Commercial was the developer of the apartment complexes at issue in the Edgewood Lawsuit and sold the apartment complexes to Edgewood on or about April 1, 2013.

[8.]    Mesa Underwriters Specialty Insurance Company ("MUSIC")  is an insurance company licensed to do business in the State of North Dakota.

2

[9.]   Edgewood Properties LLLP is insured under a Commercial General Liability Policy issued by Mesa Underwriters Specialty Insurance Company ("MUSIC"), Policy No. MP0082002000056, with a policy period from 07/26/2018 to 07/26/2019 with an each occurrence limit of $1,000,000 and a general aggregate limit of $2,000,000.

[10.]   The claims made by Edgewood in the Edgewood Lawsuit and the Amended Complaint constitute a separate "occurrence," thereby triggering a separate coverage limit of $1,000,000. Thus, MUSIC has an obligation to defend and indemnify up to its policy limit which provides each occurrence limits of $1,000,000 and general aggregate liability limits of $2,000,000.

[11.]   According to the MUSIC Commercial General Liability Insurance Policy issued to Edgewood Properties LLLP, Dakota Commercial would qualify as an insured.  Under **SECTION II-WHO IS AN INSURED**, under paragraph 2.b, the policy provides that each of the following is also an insured:

> **b.**   Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

This language appears on page 10 of 16 of CG 00 01 04 13.

[12.]   Additionally, the Endorsement entitled "ADDITIONAL INSURED-DESIGNATED PERSON OR ORGANIZATION" (which is identified as CG 20 26 07 04) provides:

> Any person or organization to which you are obligated by virtue of a written contract to provide insurance such as is afforded by this policy, but only with respect to occurrences taking place after such written contract has been executed.

[13.]   Dakota Commercial's Policy with FUMIC contains an Other Insurance Clause which requires EVI·McEnroe and its insurer to provide primary coverage.

3

[14.]    Additionally, the FUMIC policy issued to Dakota Commercial & Development Co. includes Endorsement CG 22 70 11 85 entitled "REAL ESTATE PROPERTY MANAGED", which provides:

> This endorsement modifies insurance provided under the following:
>
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
>
> This insurance does not apply to "property damage" to property you operate or manage or as to which you act as agent for the collection of rents or in any other supervisory capacity.
>
> With respect to your liability arising out of your management of property for which you are acting as real estate manager this insurance is excess over any other valid and collectible insurance available to you.

As this endorsement reads above, the FUMIC policy issued to Dakota Commercial is excess over any other applicable coverage for liability arising out of its management of a property for which they are acting as a real estate manager.

[15.]    On December 27, 2023, FUMIC tendered the defense on behalf of Dakota Commercial & Development Co. to Defendant Mesa Underwriters Specialty Insurance Company ("MUSIC") to defend Dakota Commercial in the Edgewood Lawsuit.  A copy of the tender of defense letter is attached as Exhibit 2.

[16.]    On July 11, 2024, MESA Underwriters Specialty Insurance Company ("MUSIC") denied the tender of defense.  A copy of the denial letter is attached as Exhibit 3.

[17.]    According to the Property Management Agreement entered into between EVI McEnroe Apartments, LLC and Dakota Commercial & Development Co. dated April 1, 2013, "Owner" (EVI McEnroe Apartments, LLC) is required to indemnify and hold "Manager" (Dakota Commercial) harmless from and against any loss, costs, expense, liability or claims of any kind or nature whatsoever arising from or in connection with Manager's performance of its duties under

4

this Agreement. Additionally, Owner agrees to name Manager as an additional insured on all liability insurance maintained by Owner at no cost to Manager.

[18.]    In *Farmers Union Mutual Insurance Company vs. Mesa Underwriters Specialty Insurance Company*, Case No.: 18-2021-CV-2368, venued in Grand Forks County District Court, the Honorable District Judge Donald Hager ruled in his *Order Granting Plaintiff's Motion for Summary Judgment*, dated February 22, 2022, that the liability insurance policy issued by MUSIC is primary, and owed the primary duty to defend Dakota Commercial regarding the damage claims involved in the Underlying Lawsuits entitled *Paul W. Anderson, Elijah J. Hylden, Amanda J. Seim, Steven A. Thompson, Benjamin H. Thompson v. Edgewood Real Estate Investment Trust, EVI McEnroe Apartments, LLC; Community Contractors, Inc.; Dakota Commercial & Development Co.; ICON Architectural Group, LLC; ICON Architectural Group, PLLC; A & L Siding and Home Improvement Center, Inc. and Investors Management & Marketing, Inc., Edgewood Properties, LLLP; and Remer Iron Works, Inc.*, an action venued in Grand Forks County District Court, North Dakota ("Underlying Lawsuits").

[19.]    Judge Hager's Order is res judicata and/or collateral estoppel and obligates MUSIC to indemnify FUMIC in the event there is a separate occurrence.

[20.]    FUMIC, as the insurer of Dakota Commercial, contributed $500,000 on behalf of Dakota Commercial to resolve any and all claims against Dakota Commercial in the Edgewood Lawsuit.

[21.]    FUMIC, as the insurer of Dakota Commercial, has paid defense costs, including attorney's fees, costs and disbursements, in the sum of $80,587.05 in defending the Edgewood Lawsuit. FUMIC will continue to incur defense costs, including attorney's fees, costs and disbursements in this declaratory judgment action.

5

[22.]   FUMIC is entitled to indemnity from Defendant Mesa Underwriters Specialty Insurance Company (MUSIC) for the amount of the settlement in the amount of $500,000 paid on behalf of Dakota Commercial in the Edgewood Lawsuit and for all amounts paid for defense costs incurred in the sum of $80,587.05, and for any future defense costs incurred due to the failure of Defendant MUSIC to provide for the primary defense and indemnity of Dakota Commercial.

[23.]   Defendant MUSIC provides primary liability insurance coverage to Dakota Commercial under its Commercial General Liability Insurance Policy issued to Edgewood Properties, LLLP, and MUSIC is obligated to reimburse FUMIC for all defense costs incurred to date and to be incurred in the future.

## PRAYER FOR RELIEF

[24.]   **WHEREFORE**, Plaintiff Farmers Union Mutual Insurance Company prays that the Court enter judgment declaring that:

1.      Dakota Commercial & Development Co., is an insured under the Mesa Underwriters Specialty Insurance Company Commercial General Liability Insurance Policy issued to Edgewood Properties LLLP;

2.      The Mesa Underwriters Specialty Insurance Company Commercial General Liability Insurance Policy issued to Edgewood Properties LLLP is primary for the defense and indemnity of Dakota Commercial;

3.      The FUMIC Commercial General Liability Policy issued to Dakota Commercial & Development Co. is excess over any other applicable coverage, including the coverage provided by Defendant Mesa Underwriters Specialty Insurance Company;

6

4.      Defendant Mesa Underwriters Specialty Insurance Company is obligated to indemnify FUMIC for the settlement paid on behalf of Dakota Commercial in the amount of $500,000 in the Edgewood Lawsuit;

5.      Defendant Mesa Underwriters Specialty Insurance Company is obligated to indemnify FUMIC for any defense costs incurred in the Edgewood Lawsuit, including attorney's fees, costs and disbursements already incurred and those defense costs incurred in the future;

6.      Plaintiff Farmers Union Mutual Insurance Company be awarded its costs, disbursements and such other relief as may be just and equitable.

## JURY DEMAND

[25.]   **PLAINTIFF DEMANDS A TRIAL BY JURY OF NINE ON ALL ISSUES TRIABLE BEFORE A JURY.**

Dated this 29th day of July, 2025.

William P. Harrie, ND ID#04411
Nilles Law Firm
1800 Radisson Tower
201 North Fifth Street
P.O. Box 2626
Fargo, ND 58108-2626
Phone: 701-237-5544
E-Mail: wharrie@nilleslaw.com
Attorneys for Plaintiff
Farmers Union Mutual Insurance Company

7

STATE OF NORTH DAKOTA            IN DISTRICT COURT

COUNTY OF GRAND FORKS      NORTHEAST CENTRAL JUDICIAL DISTRICT

| | |
|---|---|
| Edgewood Properties, LLLP; EVI McEnroe Apartments, LLC; EVI Campus Place, LLC; and EVI Mandan Apartments, LLC, | Case No. 18-CV-2023-1677 |
| Plaintiffs, | **AMENDED COMPLAINT** |
| vs. | |
| Community Contractors, Inc.; Dakota Commercial & Development Co.; McEnroe Place, LLC; McEnroe Place, LLC #2; McEnroe Place LLC 3; Village Real Estate, L.L.C.; Campus Place Investments LLC 6; CRT Investments, LLC; and Turning Point, LLC, | **EXHIBIT 1** |
| Defendants, | |
| vs. | |
| Community Contractors, Inc., | |
| Third-Party Plaintiff, | |
| vs. | |
| A & L Siding and Home Improvement Center, Inc.; and Remer Iron Works, Inc., | |
| Third-Party Defendants. | |

[1]     Plaintiffs, for their Amended Complaint in the above-referenced action, state and allege as follows:

## PARTIES

[2]     Edgewood Properties, LLLP ("Edgewood Properties"), is a North Dakota limited liability limited partnership with its principal place of business in Fargo, North Dakota.

Edgewood Properties owns, either directly or indirectly, commercial real estate and multi-family housing properties in North Dakota and elsewhere.

[3]    EVI McEnroe Apartments, LLC ("McEnroe") is a Delaware LLC registered to do business in North Dakota. McEnroe owns the McEnroe I, II, and III apartment complexes in Grand Forks, North Dakota.

[4]    EVI Campus Place, LLC ("Campus Place") is a Delaware LLC registered to do business in North Dakota. Campus Place owns the Campus Place V and VI apartment complexes in Grand Forks, North Dakota.

[5]    EVI Mandan Apartments, LLC ("Mandan") is a North Dakota LLC that owns the Mandan Place apartment complex in Mandan, North Dakota.

[6]    McEnroe, Campus Place, and Mandan are wholly owned by Edgewood Properties.

[7]    The six apartment complexes are referred to collectively as the "Apartment Complexes." The Apartment Complexes were owned by Defendants McEnroe Place, LLC; McEnroe Place, LLC #2; McEnroe Place LLC 3; Village Real Estate, L.L.C.; Campus Place Investments LLC 6; and CRT Investments, LLC.

[8]    Each of those six LLC Defendants was, upon information and belief, a single-purpose LLC created for the purpose of holding the Apartment Complexes (the "Holding LLCs"). Each of the Holding LLCs has its principal place of business in Grand Forks, North Dakota.

[9]    The McEnroe I and McEnroe II apartment complexes were initially owned and held by Turning Point, LLC ("Turning Point"). Turning Point is also a North Dakota LLC, and also has its principal place of business in Grand Forks, North Dakota.

[10]    Community Contractors, Inc. ("Community") is, upon information and belief, a North Dakota corporation with its principal place of business in Grand Forks, North Dakota. Community is, among other things, a general contractor operating in the State of North Dakota. Community built, and was the general contractor and co-developer for, each of the Apartment Complexes now owned by McEnroe, Campus Place, and Mandan identified above. A & L Siding and Home Improvement Center and Remer Iron Works were subcontractors of Community.

[11]    Dakota Commercial & Development Co. ("Dakota") is, upon information and belief, a North Dakota Subchapter S corporation with its principal place of business in Grand Forks, North Dakota. Dakota is a property development and property management company operating in Grand Forks County and elsewhere in North Dakota. Dakota, along with Community, was the co-developer of each of the six Apartment Complexes identified above. Dakota managed the Apartment Complexes as described below.

[12]    Community, upon information and belief, retained certain subcontractors to provide services regarding the six Apartment Complexes, including the McEnroe III apartment complex. A & L Siding and Home Improvement Center and Remer Iron Works were subcontractors of Community.

**JURISDICTION AND VENUE**

[13]    Jurisdiction and venue in Grand Forks County is proper as most of the acts and omissions giving rise to this action occurred in Grand Forks County. Five of the Apartment Complexes in question were designed, constructed, and developed in Grand Forks County. Work related to the Mandan apartment complex was also done, in part, in Grand Forks County. Community and Dakota have their principal places of business in Grand Forks County. All but

- 3 -

one of the LLC Defendants owned property in Grand Forks County and each of the LLC Defendants has their principal place of business in Grand Forks County.

## FACTUAL BACKGROUND

[14]   Community is a builder, general contractor and developer. Dakota is a developer and property management company. Community and Dakota, through Turning Point and the Holding LLCs, developed each of the six Apartment Complexes at issue in this action.

[15]   Community constructed each of the six Apartment Complexes at issue in this action. Once constructed, Dakota then managed five of the Apartment Complexes at issue in this action.

[16]   Community and Dakota, or their owners and officers, formed the Holding LLCs named as Defendants, along with Turning Point, to own and hold each of the six Apartment Complexes. Community and Dakota, or their owners and officers, were controlling owners of each of the LLCs.

[17]   Each of the six Apartment Complexes was designed and constructed with what are commonly known as "Romeo and Juliette" balconies accessed by sliding doors. The balconies are approximately 18 inches in width. They are designed to be accessed from sliding doors. They are not designed to have furniture, grills, or other items placed on them.

[18]   The support for the balconies is substantially the same at all six Apartment Complexes, including the McEnroe III apartment complex.

[19]   The balconies are supported by a bracket system attached to the bottom of the balconies and then to the exterior of the buildings.

[20]   The brackets and balconies were secured only by lag bolts, which are effectively large screws, that are screwed into wood supports in the sides of the buildings. Each balcony was also supported by two (2) kickers directly below the balcony.

- 4 -

[21]    The wood, the lag bolts, and the supporting structures were then covered by siding material and flashing such that the support system and structural soundness of the support system could not be observed through inspection.

[22]    The Apartment Complexes did not have adequate materials to prevent water infiltration from occurring through the siding and flashing at the support points for the balconies. Proper construction techniques necessary to prevent water infiltration were not otherwise employed.

[23]    The design, absence of proper materials to prevent water infiltration, and the lack of other appropriate construction techniques to prevent water infiltration, could similarly not be observed through inspection.

[24]    Over time, water passed through the exterior siding and flashing causing the wood supports beneath the siding and flashing to both become wet and then to stay wet for extended periods of time.  That, in turn, caused the wood supports for the balconies to rot and fail over time.  When the wood supports fail, the balconies fail.

[25]    The design and construction, including the use of untreated and inadequate wood supports, the use of lag bolts, the failure to prevent water infiltration, the failure to have supporting structures made of materials other than wood, and other errors and omissions created an unsafe condition with respect to all of the balconies at all six Apartment Complexes.

[26]    In the early morning of June 8, 2019, five individuals were standing on a fourth floor balcony at the McEnroe III apartment complex in Grand Forks.  The balcony broke free from the building.  All five individuals were injured in the resulting fall. All five individuals filed separate lawsuits which were ultimately consolidated for pre-trial purposes.  Those lawsuits

- 5 -

named Community, Dakota, ICON, Edgewood, McEnroe, Campus Place and the Third-Party Defendants in this Amended Complaint as defendants. ("Personal Injury Litigation")

[27]    The balcony involved in the Personal Injury Litigation, included all of the construction flaws, errors, and omissions described above.

[28]    The limited engineering and architectural input, oversight, planning, and construction of the balcony where the accident took place and of the other balconies at the six Apartment Complexes were inadequate, negligent, and not in accord with applicable industry standards or building codes. Such errors and omissions created an unsafe condition leading to the June 8, 2019, accident. Such errors and omissions have required that substantial remedial measures be taken to insure the safety of the other, similarly constructed balconies and, accordingly, the safety of the residents of the Apartment Complexes. Those direct costs exceed $10 million.

[29]    Such errors and omissions lower the value of the six Apartment Complexes. Such errors and omissions have caused and will continue to cause the Plaintiffs to suffer diminution in value, lost rent, lost revenue, and lost income from the Apartment Complexes.

[30]    Such errors and omissions resulted in damages, expenses and attorney fees and costs to Edgewood as a result of being named in the Personal Injury Litigation.

[31]    Each of the six Apartment Complexes were sold by the Holding LLCs, created by Community and Dakota, or their owners and officers to Edgewood Properties. In turn, Edgewood Properties placed the six Apartment Complexes in the three separate Plaintiff LLCs of which Edgewood Properties is the sole owner.

[32]    Each of the six Apartment Complexes was acquired by Edgewood Properties pursuant to a Contribution Agreement and each Contribution Agreement was executed on April 1, 2013.

[33]    Each of the Holding LLCs made substantial representations and warranties regarding the Apartment Complex it held. Each of the Holding LLCs agreed to defend and indemnify Edgewood Properties for breaches of those representations and warranties.

[34]    Each Contribution Agreement contained, among others, the following representations and warranties made by the Holding LLC owning the Apartment Complex being sold:

> 10.    Representations and Warranties by Seller. As of the Contract Date, Seller represents and warrants to Buyer as follows:
>
> 10.14 Use of Property. The Property is usable for its current uses without violating any federal, state, local or other governmental building, zoning, health, traffic, environmental, flood control, fire, safety, platting, subdivision or other law, ordinance or regulation, or any applicable private restriction, and such use is a legal conforming use.
>
> 10.15 Condition. To the best knowledge of Seller, the buildings, structures and improvements included within the Property are structurally sound and in good repair and in first-class condition, and all mechanical, electrical, heating, air conditioning, drainage, sewer, water and plumbing systems are in proper working order.

Exhibit A, pp. 11, 14.

[35]    Exhibit A is the Contribution Agreement for McEnroe III. Each of the other six Contribution Agreements contain identical representations, warranties, and indemnification obligations.

[36]    Dakota had been managing five of the six Apartment Complexes through a Property Management Agreement with Community from the time of construction through to April 1, 2013.

- 7 -

[37]    Edgewood entered into a Property Management Agreement with Dakota dated April 1, 2013, to continue to manage five of the six Apartment Complexes on their behalf.

[38]    Dakota was the property manager for five of the six Apartment Complexes from April 1, 2013 through to November 2018, just prior to the accident occurring on June 8, 2019.

[39]    Through written discovery and depositions conducted in the Personal Injury Litigation, Edgewood was made aware there were repairs made by Community and known to Dakota to reattach loose balconies on one or more of the six Apartment Complexes, prior to April, 2013.

[40]    Through discovery in the Personal Injury Litigation, Dakota produced documents, including work orders, for repairs to balconies on the McEnroe complex completed in March 2017. Dakota's work order disclosed that in October 2016, a tenant was standing on the balcony and the balcony shifted forward, away from the building.  The balcony could now be moved back and forth. A repair of that balcony was again arranged by Dakota. Dakota retained Community to make all balcony repairs where balconies were loose and needed to be reattached.

[41]    In August 2018, the owner of Community, engaged SNgenium Solutions, LLC to assess the balcony failures on Campus Place VI and requested an expert opinion regarding the deterioration and resulting detaching balconies to the building less than ten years after construction.  This assessment was completed with Dakota's knowledge and assistance as much of the siding, metal paneling and brick had to be removed on the East side of the building to conduct the assessment.

[42]    This assessment was done for and by Community and Dakota five years after the sale of Campus Place VI to Edgewood and without the knowledge or disclosure to Edgewood.

- 8 -

The assessment also occurred seven (7) months prior to the accident resulting in the Personal Injury Litigation.

[43]    Mr. Scott Fournier of SNgenium Solutions, LLC, opined that improper flashing, improper use of sealant, and faulty design and construction, is what caused the significant deterioration and rot to Campus Place VI where the balconies were attached to the building.

[44]    In summary, both Community and Dakota were involved from the outset with the construction of the six Apartment Complexes. Both were aware of the design used for the balconies and the balcony support system. Neither obtained sufficient architectural or engineering services regarding the balconies or the support of same. Both became aware of at least one loosening balcony in 2012.

[45]    Neither Community nor Dakota conducted any meaningful investigation upon first learning that a balcony was already pulling away from the McEnroe III apartment complex in 2012.

[46]    Both Community and Dakota learned of another balcony pulling away from the McEnroe III apartment complex in 2017. Again, no meaningful investigation was undertaken regarding the cause of such a concerning issue. Neither the 2012 nor the 2017 event were disclosed to Edgewood Properties.

[47]    The investigation conducted at Campus Place VI, along with the destructive testing and remedial measures, provided yet another clear warning to Community and Dakota that the balconies were at risk and the support systems were inadequate. The report, the destructive testing, and the scope of the remedial measures were never disclosed to Edgewood Properties.

- 9 -

[48]    Discovery conducted through the Personal Injury Litigation also revealed Community and/or Dakota, obtained a City of Grand Forks permit in 2017 to replace some of the ledger boards on the Campus Place VI apartment complex. This too was not disclosed to Edgewood.

[49]    Community and Dakota had actual knowledge prior to the sale of the six Apartment Complexes in April, 2013, of the defective balcony design and construction. All six of Apartment Complexes, contained the same limited engineering and architectural input, oversites, planning and construction defects. Additional balcony failures after April 1, 2013, confirmed the defective construction and design.

[50]    The Apartment Complexes, as sold, were in violation of the representations and warranties set forth in the respective Contribution Agreements. Accordingly, the Defendants are required to indemnify the Plaintiffs for the resulting expenses or damages, including reasonable attorneys' fees, for the remediation costs incurred and continuing to be incurred, along with damages in the form of lost value or diminution in value, lost rents, lost revenue, and lost income related to the defective condition of the Apartment Complexes.

[51]    Defendants' indemnification obligations also include expenses or damages, including reasonable attorneys' fees, that were paid by Edgewood in the Personal Injury Litigation.

## COUNT I
### (Negligence – Community as General Contractor)

[52]    Plaintiffs restate and reallege the preceding allegations herein.

[53]    Community was the general contractor and a developer for the six Apartment Complexes. Community was negligent in the design, construction, and oversight of the Apartment Complexes. Community was negligent in failing to obtain adequate engineering and

- 10 -

architectural input. Community was further negligent in supervising construction and failing to investigate when balconies failed. As described more fully above, the Apartment Complexes were constructed in such a manner that the balconies are not safe.

[54]    Community's negligence and non-disclosures have caused Plaintiffs actual damages in the form of third-party claims, remediation costs, diminution in value, lost rent, lost revenue, and lost income, along with attorney fees and costs and other damages and expenses.

[55]    Community is liable to the Plaintiffs in an amount to be determined at trial.

## COUNT II
### (Breach of Express and Implied Warranties – Community as General Contractor)

[56]    Plaintiffs restate and reallege the preceding allegations herein.

[57]    Community, as the general contractor and a developer for the Apartment Complexes, made express and implied warranties as to their suitability and fitness for their intended purposes as multi-family housing buildings.

[58]    Community has breached such warranties and that breach has caused Plaintiffs actual damages in the form of third-party claims, remediation costs, diminution in value, lost rent, lost revenue, and lost income, along with attorney fees and costs and other damages and expenses.

[59]    Community is liable to the Plaintiffs in an amount to be determined at trial.

## COUNT III
### (Negligence – Community and Dakota as Developers)

[60]    Plaintiffs restate and reallege the preceding allegations herein.

[61]    Community and Dakota served as developers of the six Apartment Complexes. As such, they had a duty to insure that the Apartment Complexes were properly constructed, were safe, and were fit for their intended purposes as multi-family housing buildings.

- 11 -

[62]    Community and Dakota were negligent in the design, construction, and oversight regarding the apartment projects. They were negligent in failing to obtain adequate engineering and architectural input. Their negligence has caused Plaintiffs actual damages in the form of actual damages in the form of third-party claims, remediation costs, diminution in value, lost rent, lost revenue, and lost income, along with attorney fees and costs and other damages and expenses.

[63]    Community and Dakota are liable to the Plaintiffs in an amount to be determined at trial.

## COUNT IV
### (Breach of Warranty – Community and Dakota as Developers)

[64]    Plaintiffs restate and reallege the preceding allegations herein.

[65]    Community and Dakota, as developers of the Apartment Complexes, made express and implied warranties regarding their suitability and fitness for their intended purpose as multi-family housing buildings. Community and Dakota breached such warranties and that breach has caused Plaintiffs actual damages in the form of third-party claims, remediation costs, diminution in value, lost rent, lost revenue, and lost income, along with attorney fees and costs and other damages and expenses.

[66]    Community and Dakota are liable to the Plaintiffs in an amount to be determined at trial.

## COUNT V
### (Breach of Contract, Breach of Representations and Warranties, and Duty to Indemnify – McEnroe Place, LLC; McEnroe Place, LLC #2; McEnroe Place LLC 3; Village Real Estate, L.L.C.; Campus Place Investments LLC 6; and CRT Investments, LLC)

[67]    Plaintiffs restate and reallege the preceding allegations herein.

[68]    Each of the Holding LLCs entered into a Contribution Agreement with Edgewood Properties, by which the LLCs sold their respective Apartment Complexes to Edgewood Properties.

[69]    Each of the Contribution Agreements contained representations, warranties, and indemnification obligations, including those set forth above.

[70]    Each of the Holding LLCs is in breach of the warranties and representations made. Each of the LLCs is required to indemnify Plaintiffs for expenses and damages, including reasonable attorneys' fees, arising from such breaches.

[71]    Those damages include actual damages in the form of third party claims, remediation costs, diminution in value, lost rent, lost revenue, and lost income, along with attorney fees and costs and other damages and expenses.

[72]    McEnroe Place, LLC, McEnroe Place, LLC #2, McEnroe Place LLC 3, Village Real Estate, L.L.C., Campus Place Investments LLC 6, and CRT Investments, LLC, are liable to the Plaintiffs in an amount to be determined at trial.

## COUNT VI
### (Fraud under N.D.C.C. § 9-03-08, and Deceit under N.D.C.C. § 9-10-02, McEnroe Place, LLC; McEnroe Place, LLC #2; McEnroe Place LLC 3; Village Real Estate, L.L.C.; Campus Place Investments LLC 6; and CRT Investments, LLC)

[73]    Plaintiffs restate and reallege the proceeding allegations herein.

[74]    Each of the Holding LLCs entered into a Contribution Agreement with Edgewood Properties, by which the LLCs sold their respective Apartment Complexes to Edgewood Properties.

[75]    The LLC's had actual knowledge of the construction defects which resulted in deterioration and rotting of the balconies attached to the Apartment Complexes. They had actual

- 13 -

knowledge of that adequate engineering and architectural services had not been obtained. They had actual knowledge of a balcony failure in 2012.

[76] The Holding LLCs suppressed information of which they had knowledge or belief of facts, regarding the construction defects of the balconies on all of Apartment Complexes.

[77] Each of the Holding LLCs, committed specific acts of fraud and deceit in order to deceive Edgewood and benefit financially.

[78] The damages caused by the deceit and fraud of the Holding LLCs, includes actual damages in the form of third-party claims, remediation costs, diminution in value, lost rent, lost revenue, lost income, damage to business reputation, attorney fees and costs and other expenses.

[79] McEnroe Place, LLC; McEnroe Place, LLC #2, McEnroe Place LLC 3; Village Real Estate, L.L.C., Campus Place Investments LLC 6; and CRT Investments, LLC, are liable to Plaintiffs in an amount to be determined at trial.

## COUNT VII
### (Fraud N.D.C.C. § 9-03-08 and Deceit N.D.C.C. § 9-10-02 – Dakota and Community)

[80] Plaintiffs restate and reallege the proceeding allegations herein.

[81] From April 1, 2013 through to November 2018, Dakota was subject to a Property Management Agreement with Edgewood to manage five of the Apartment Complexes. Dakota had contractual obligations to "… maintain the Premises in a manner consistent with the management and operation of a high-quality apartment community and in a manner reflective of standards set forth by the real estate management industry. Manager shall act in a fiduciary capacity with respect to the proper protection of an accounting of the Premises."

[82] Dakota also had a contractual obligation to institute and supervise "necessary repairs to the Premises," as a fiduciary of Edgewood.

- 14 -

[83]    Dakota had actual knowledge of, and/or suppressed disclosure of information, related to the balcony repairs from 2012 through to 2018.  Dakota engaged Community to make all balcony repairs and failed to disclose the defective and unsafe condition of the deteriorating balconies to Edgewood.

[84]    Dakota had actual knowledge of, and/or suppressed the disclosure of information related, to the balcony deterioration and wood rot to Campus Place VI, when it allowed Community in August 2018 to engage a third party to complete an assessment of the deterioration of exterior stud walls and truss framing and withheld this information from Edgewood.  Community also had actual knowledge of the described events.

[85]    Dakota and Community conspired to commit fraud and/or deceit by failing to disclose the deteriorating and unsafe balconies which they were repairing from 2012, through November of 2018, while suppressing this information from Edgewood, for their financial benefit.

[86]    The damages caused by Dakota and Community's fraud and deceit, and conspiracy to engage in fraud and deceit, include payment of third-party claims, including expenses and attorney's fees, remediation costs, diminution in value, lost rent, lost revenue, and lost income, along with other damages and expenses.

[87]    Dakota is liable to Plaintiffs in an amount to be determined at trial.

## COUNT VIII
### (Breach of Contract – Dakota as Property Manager)

[88]    Plaintiffs restate and reallege the proceeding allegations herein.

[89]    Dakota entered into a Property Management Agreement with Edgewood dated April 1, 2013.

- 15 -

[90]    Dakota breached Article 6 and Article 7 of the Property Management Agreement with Edgewood, as a result of its failure to notify Edgewood of the deteriorating, unsafe, and defective balconies that it had actual knowledge of from 2012 through to November 2018. Dakota also failed to satisfy its contractual duties by not further investigating the unsafe conditions of which it became aware.

[91]    Dakota's breach of its contractual and fiduciary obligations under Article 6 of the Property Management Agreement, resulted in Edgewood's lack of knowledge and inability to immediately remediate the deteriorating balconies including the unsafe balcony which detached from the building, resulting in the Personal Injury Litigation.

[92]    Dakota's breach of its contractual and fiduciary obligations to Edgewood, to inform Edgewood of the deteriorating, unsafe and defective balconies resulted in damages, attorney's fees and expenses paid by Edgewood in the Personal Injury Litigation, remediation costs, diminution in value, lost rent, lost revenue, and lost income, along with other damages and expenses.

[93]    Dakota is liable to the Plaintiffs in an amount to be determined at trial.

[94]    WHEREFORE, Plaintiffs request that judgment be entered as follows:

(a)    Against Community, pursuant to Counts I-IV and VII for damages in an amount to be determined at trial;

(b)    Against Dakota, pursuant to Counts III, IV, VII, and VIII, for damages in an amount to be determined at trial;

(c)    Against the LLC Defendants, pursuant to Count V and VI, for damages in an amount to be determined at trial;

(d)    For an award of attorneys' fees and expenses against the Holding LLCs; and,

(e)    For such other and further relief as the Court finds just and equitable.

Dated: July 27, 2023

Todd E. Zimmerman #05459
Benjamin J. Hasbrouck #06107
Aubrey J. Zuger #06281
Beverley L. Adams #05329
FREDRIKSON & BYRON, P.A.
51 Broadway, Suite 400
Fargo, ND 58102-4991
Telephone: (701) 237-8200
tzimmerman@fredlaw.com
bhasbrouck@fredlaw.com
azuger@fredlaw.com
badams@fredlaw.com

Attorneys for Plaintiffs

77165146 v2

- 17 -

## CONTRIBUTION AGREEMENT

THIS CONTRIBUTION AGREEMENT is entered into and effective as of April 1, 2013 (the "Effective Date") between McEnroe Place, LLC, a North Dakota limited liability company ("Seller"), and **Edgewood Properties, LLLP,** a North Dakota limited liability limited partnership, or its assigns, ("Buyer").

In consideration of this Agreement, Seller and Buyer agree as follows:

1.    Definitions and Exhibits.

1.1    Definitions. For purposes of this Agreement, each of the following terms, when used herein with an initial capital letter, will have the meaning ascribed to it as follows:

1.1.1    Agreement. This Contribution Agreement.

1.1.2    Building(s). A building consisting of forty-four (44) apartment units located in Grand Forks, North Dakota.

1.1.3    Buyer's Closing Documents. Buyer's closing documents described in Section 5.2.

1.1.4    Closing. The closing and consummation of the purchase and sale of the Property as described in Section 5.

1.1.5    Closing Date. The date on which the Closing occurs as provided in Section 5.

1.1.6    Closing Documents. Buyer's Closing Documents and Seller's Closing Documents as defined in Section 5.

1.1.7    Contract Date. The date upon which this Agreement is deemed effective, which is the date this Agreement has been executed by both Buyer and Seller, as set forth in the first paragraph on the top of page 1 of this Agreement.

1.1.8    Contracts. All of the service and management contracts, leasing and brokerage contracts, equipment and personal property leases, labor and material contracts, maintenance and repair contracts including elevator service contracts and HVAC service contracts and other agreements (other than the Resident Contracts) that affect the Property or the operation, repair or maintenance thereof; a complete list of all Contracts is attached hereto as Exhibit E.

1.1.9    Effective Date has the meaning as set forth in the introductory paragraph.

1.1.10 Environmental Law. Any federal, state, or local law, statute, code, enactment, ordinance, rule, regulation, permit, consent, approval, authorization, license, judgment, order, writ, decree, injunction, common law (including without limitation the common law respecting nuisance and tortious liability), or other requirement having the force and effect

- 1 -

**EXHIBIT A**

of law or regulation, relating to the protection of human health and safety, occupational health and safety, the environment or natural resources and wildlife, including without limitation (i) emissions, discharges, spills, Releases or threatened Releases of Hazardous Substances into ambient air, surface water, ground water, watercourses, publicly or privately owned treatment works, drains, sewer systems, wetlands, or septic systems; (ii) the use, treatment, storage, disposal, handling, manufacturing, transportation or shipment of Hazardous Substances; and (iii) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), the Resource Conservation and Recovery Act ("RCRA"), the Clean Air Act and the Clean Water Act, the Safe Drinking Water Act and the Solid Waste Disposal Act, all as amended and in effect on the Closing Date and any regulations promulgated thereunder.

1.1.11 Environmental Matters. Any obligation or liability arising under any Environmental Law.

1.1.12 Hazardous Substance. Any substance which is (i) defined as a hazardous substance, hazardous material, hazardous waste, pollutant, contaminant, or extremely or imminently hazardous substance or material under any Environmental Law, (ii) petroleum and petroleum products including crude oil and any fraction thereof, PCBs, asbestos, natural gas, synthetic gas, and any mixtures or derivatives of the above, (iii) dangerous, toxic, flammable, corrosive, radioactive, infectious, toxic or carcinogenic, or (iv) regulated pursuant to any Environmental Law.

1.1.13 Improvements. The Building(s) and any other buildings, structures and improvements located on the Land, including Seller's interest in all systems, facilities, fixtures, machinery, equipment or conduits to provide fire protection, security, heat, exhaust, ventilation, air conditioning, electrical power, light, plumbing, refrigeration, gas, sewer or water thereto (including all replacements or additions thereto between the Contract Date and the Closing Date).

1.1.14 Land. All those tracts or parcels of land described in Exhibit A attached hereto and all privileges, rights, rights of way, easements, hereditaments and appurtenances thereto belonging, and all right, title and interest of Seller in and to any streets, alleys, passages and other rights of way included therein or adjacent thereto (before or after the vacation thereof).

1.1.15 Material Adverse Effect or Material Adverse Change. Shall mean any change, effect, event or condition, individually or in the aggregate, that has had a material adverse effect on the Property, prospects, conditions (financial or otherwise) or results of operations of the Property; provided, however, that in determining whether a Material Adverse Effect or Adverse Material Change has occurred, the effect or change to the extent attributable to the following shall not be considered:

     (i)    Changes in laws, rules or regulations of general applicability or interpretations thereof by governmental entities;

     (ii)    Changes in prevailing interest rates;

     (iii)    Changes in general economic conditions.

- 2 -

1.1.16 <u>Notice to Proceed</u>. The Notice to Proceed described in Section 5.

1.1.17 <u>Permitted Title Exceptions</u> shall mean (i) encumbrances for taxes and other governmental charges and assessments that are not yet due and payable or which are being contested in good faith by appropriate proceedings; (ii) the title insurers standard printed exceptions; (iii) those exceptions approved or deemed approve by Section 3 and Section 7.2; and (iv) encumbrances that will be removed prior to or in connection with the Closing.

1.1.18 <u>Permits and Licenses</u>. Seller's interest in the permits and licenses listed on <u>Exhibit B</u> attached hereto.

1.1.19 <u>Personal Property</u>. All of the personal property, together with all replacements and additions thereto between the Contract Date and the Closing Date, located in or on the Property which is owned by Seller and used or usable in connection with the Property, including without limitation, all that property listed on <u>Exhibit C</u> attached hereto.

1.1.20 <u>Plans</u>. All originals and copies of the as-built blueprints, drawings, site plans, engineering and architectural plans and specifications, and land use and zoning materials for the Land and Improvements, as may be in the possession of Seller or under its control, including without limitation, those plans listed on <u>Exhibit D</u> attached hereto.

1.1.21 <u>Property</u>. All of Seller's right, title and interest in, to and under the following:

(i)     the Land;

(ii)    the Improvements;

(iii)   the Personal Property;

(iv)    the Resident Contracts;

(v)     the Surviving Contracts;

(vi)    the Warranties;

(vii)   the Permits and Licenses;

(viii)  the Plans; and

(ix)    a copy of the Records.

1.1.22 <u>Proration Date</u>. The effective date of the prorations provided in Section 6, which is 11:59 p.m. on the day before the Closing Date.

1.1.23 <u>Contribution Price</u>. The purchase price for the Property described in Section 3.

1.1.24 <u>Re-Proration Date</u>. The Re-Proration Date defined in Section 6.7.

1.1.25 Records. Any books, records, bills, invoices, and files within Seller's control regarding the Land, Improvements, and the Personal Property.

1.1.26 Release. Any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of any Hazardous Substance into the environment (including the abandonment or discarding of barrels, containers, or other closed receptacles containing any Hazardous Substance).

1.1.27 Resident Contracts means any contracts or agreements between Seller and the residents of the Property. The Resident Contracts shall be assigned to Buyer by the Seller in accordance with the Assignment and Assumption Agreement attached to this Agreement as Exhibit F.

1.1.28 Resident Deposits has the meaning set forth in Section 20.7.

1.1.29 Seller's Closing Documents. Seller's Closing Documents described in Section 5.1 hereof.

1.1.30 Seller's Knowledge means the current, actual knowledge of Kevin Ritterman or Craig Tweten.

1.1.31 Survey. The survey of the Land and Improvements described in Section 4.3.

1.1.32 Surviving Contracts. Those Contracts which Buyer elects in writing to assume, pursuant to Section 9 and which will be assigned to Buyer at the Closing.

1.1.33 Title Commitment. The commitment to issue the Title Policy described in Section 7.1.1.

1.1.34 Title Company. The Title Company, Fargo, North Dakota.

1.1.35 Title Evidence. The Title Evidence described in Section 7.1.

1.1.36 Title Objections. Buyer's Title Objections described in Section 7.2.

1.1.37 Title Policy. A current American Land Title Association Form Owner's Title Insurance Policy for the Land and Improvements issued by Title Company in the full amount of the Purchase Price, subject only to the Permitted Title Exceptions, covering title to the Land and Improvements and all appurtenant easements, showing Buyer as owner of the Land and Improvements, and providing for full extended coverage over all general title exceptions contained in a standard policy.

1.1.38 Units shall mean limited partnership units in Buyer.

1.1.39 Warranties. Those warranties, guaranties and similar contracts in favor of Seller or Seller's predecessors on equipment or improvements pertaining to the acquisition, construction, design, use, operation, management or maintenance of the Property.

- 4 -

1.2    Exhibits. Attached hereto and forming an integral part of this Agreement are the following exhibits, all of which are incorporated into this Agreement as fully as if the contents thereof were set out in full herein at each point of reference thereto:

Exhibit A -    Legal Description of Land

Exhibit B -    List of Permits and Licenses

Exhibit C -    List of Personal Property

Exhibit D -    List of Plans

Exhibit E -    List of Contracts

Exhibit F -    Assignment and Assumption Agreement

2.    Purchase and Sale of Property. Subject to and in accordance with the terms and provisions hereof, Seller agrees to transfer to Buyer, and Buyer agrees to accept from Seller, the Property. The transaction shall be structured in accordance with IRC § 721.

3.    Contribution Price and Manner of Payment. The total purchase price ("Contribution Price") for the Property is Four Million Nine Hundred Thousand Dollars ($4,900,000) consisting of Four Hundred Eight Thousand Three Hundred Thirty-four (408,334) limited partnership units in Edgewood Properties, LLLP ("Units") issued at a value of $12.00 per Unit. The amount of Units shall be adjusted, either increased or decreased, to the extent the Buyer assumes indebtedness of Seller and to reflect the adjustments as set forth in Section 6.5.

4.    Contingencies. Buyer's obligations under this Agreement are contingent upon Buyer's satisfaction with each of the following:

4.1    Document Inspection. Buyer may inspect the Property and examine, review, inspect and copy the books and records relating to the ownership and operation of the Property. Seller will make the Property available for Buyer's inspection in accordance with Section 4.2. Within 10 days after the Contract Date, Seller will deliver to Buyer complete copies of each of the following documents related to the Property that it has in its possession or under its control, or that is reasonably obtainable by Seller:

4.1.1    All Contracts. Seller will update the list of Contracts attached hereto as Exhibit E to a date which is not more than 10 days prior to the Closing Date;

4.1.2    All Plans;

4.1.3    All certificates of occupancy for the Building, all Permits and Licenses, authorizations and approvals required by law or by any governmental authority having jurisdiction over the Property, relating to the construction, occupancy, operation or present use of the Property;

4.1.4   An updated list of Personal Property updated to a date not more than 10 days prior to the Closing Date;

4.1.5   All Warranties;

4.1.6   All environmental reports (including any currently existing Phase I or Phase II reports, inspection reports, audits, compliance documentation, permits, closure letters, no-action letters, no-association letters, and other environmental documents and records) pertaining to the Property or any activities or operations at any time on the Property and copies of all records concerning the presence, location and quantity of Hazardous Substances, asbestos containing materials and presumed asbestos containing materials at the Property;

4.1.7   Any prior surveys of the Property;

4.1.8   Any other information or documentation relating to the design, construction, layout, structure, mechanical, electrical and plumbing systems, fire protection systems and subsurface conditions relating to the Property; and

4.1.9   Those Records requested by Buyer.

4.2   Physical Inspection.  Buyer and its agents will have the right, from time to time prior to the Closing, to enter upon the Property to examine the same and the condition thereof and to conduct such surveys and to make such engineering and other inspections, tests and studies as Buyer determines to be reasonably necessary, all at Buyer's sole cost and expense.

Buyer will give Seller advance notice of such examinations or surveys and will conduct such examinations or surveys during normal business hours to the extent practicable.  Buyer will conduct all examinations and surveys of the Property in a manner that will not harm or damage the Property or cause any claim adverse to Seller and will restore the Property to its condition prior to any such examinations or surveys immediately after conducting the same.

Buyer will indemnify, defend, and hold Seller harmless from and against any claims for injury or death to persons, damage to property or other losses, damages or claims, and including, in each instance, reasonable attorneys' fees and litigation costs, arising out of any action of any person or firm entering the Property on Buyer's behalf as aforesaid, which indemnity will survive the Closing and any termination of this Agreement with or without the Closing having occurred.  Notwithstanding the foregoing, Buyer will not be liable merely for the discovery of a pre-existing condition at the Property.

4.3   Survey.  Within 30 days after the Contract Date, Buyer may obtain, at Buyer's expense, a current survey of the Property prepared by a registered land surveyor in form acceptable to Buyer (the "Survey").

The Deed to be delivered by Seller to Buyer at the Closing will contain the legal description of the Property as shown by the survey.

4.4     Government Approvals. Buyer shall have obtained at its sole cost and expense all final governmental approvals necessary in Buyer's judgment in order to make the use of the Property which Buyer intends.

5.      Closing. The Closing Date will be that date five (5) days after Buyer complete its due diligence and notifies Seller of Buyer's desire to proceed with the purchase of the Property ("Notice to Proceed"). The Closing will take place at 10:00 a.m. Central Standard Time at the office of The Title Company in Fargo, North Dakota, or at such other place as may be agreed to. Seller will deliver possession of the Property to Buyer on the Closing Date.

5.1     Seller's Closing Documents. On the Closing Date, Seller will execute and/or deliver to Buyer (as applicable) the following (collectively, "Seller's Closing Documents"), all in form and content reasonably satisfactory to Buyer:

5.1.1   Deed. A Warranty Deed conveying the Property to Buyer, free and clear of all encumbrances, except the Permitted Title Exceptions.

5.1.2   Bill of Sale. A Warranty Bill of Sale transferring the Personal Property, free and clear of all encumbrances.

5.1.3   Assignment and Assumption of Surviving Contracts, Permits and Licenses and Warranties. An Assignment and Assumption of Surviving Contracts, Permits and Licenses and Warranties assigning to Buyer the Surviving Contracts, Permits and Licenses and Warranties, free and clear of all encumbrances, together with the consent of all parties having a right to consent to such assignment, if necessary.

5.1.4   Title Policy. A pro forma Title Policy, or a suitably marked up Title Commitment initialed by the Title Company, obligating the Title Company to issue the Title Policy to Buyer, in the form required by this Agreement and as approved by Buyer.

5.1.5   Bring-down Certificate. A Bring-Down Certificate, stating that Seller's representations and warranties are true and correct as of the Closing Date.

5.1.6   Seller's Affidavit. A Seller's Affidavit indicating that on the Closing Date there are no outstanding, unsatisfied judgments, tax liens or bankruptcies against or involving Seller or the Property; that there has been no skill, labor or material furnished to the Property for which payment has not been made or for which mechanics' liens could be filed; and that there are no other unrecorded interests in the Property, together with any standard owner's affidavit and/or indemnity (ALTA Form) which may be required by Title Company to issue the Title Policy.

5.1.7   Original Documents. Originals of the Surviving Contracts, the Permits and Licenses, the Warranties and the Plans.

5.1.8   Non-Foreign Certificate. A non-foreign certificate, properly executed, containing such information as is required by Internal Revenue Code Section 1445(b) (2) and its regulations.

- 7 -

5.1.9    Abstract of Title. The abstract of title if the Property has an abstract, as it may exist.

5.1.10  IRS Form. A Designation Agreement designating the "reporting person" for purposes of completing Internal Revenue Form 1099 and, if applicable, Internal Revenue Form 8594.

5.1.11  Keys. All keys owned by and in possession of Seller used in connection with the Property including key cards, security codes, and combinations to any safes.

5.1.12  Resident Deposits. All Resident Deposits held by Seller.

5.1.13  Other Documents. All other documents reasonably determined by Buyer to be necessary to transfer the Property to Buyer free and clear of all encumbrances, except the Permitted Title Exceptions.

5.2    Buyer's Closing Documents. On the Closing Date, Buyer will execute and/or deliver to Seller (as applicable) the following (collectively, "Buyer's Closing Documents") all in form and content reasonably satisfactory to Seller:

5.2.1    Membership Units. The Units described in Section 3.

5.2.2    Assignment and Assumption of Surviving Contracts, Permits and Licenses and Warranties. An Assignment and Assumption of Surviving Contracts, Permits and Licenses and Warranties by which Buyer assumes all obligations of Seller under the Surviving Contracts, Permits and Licenses and Warranties that accrue after the Closing Date.

5.2.3    IRS Form. A Designation Agreement designating the Title Company as the "reporting person" for purposes of completing Internal Revenue Form 1099 and, if applicable, Internal Revenue Form 8594.

5.2.4    Title Documents. Such affidavits of purchaser, certificates of real estate value or other documents as may be reasonably required by Title Company in order to record the Deed and issue the Title Policy required by this Agreement.

6.    Prorations. Seller and Buyer agree to the following proration and allocation of costs regarding this Agreement:

6.1    Title Insurance and Closing Fee. Seller will pay all costs of the Title Commitment and the fees charged by the Title Company for any escrow required regarding Buyer's Title Objections. Buyer will pay the premium for the Title Policy and any additional premiums required for the issuance of any mortgagee's title policy required by Buyer. Seller and Buyer will each pay ½ of any reasonable and customary closing fee, escrow fee, or charge imposed by the Title Company.

6.2    Recording Costs. Seller will pay the cost of recording all documents necessary to place record title in the condition warranted by Seller in this Agreement. Buyer will pay the cost of recording the Deed and all other documents.

- 8 -

6.3     Real Estate Taxes and Special Assessments. General real estate taxes and special assessment installments payable for the 2012 year and all years prior to Closing will be paid by Seller. General real estate taxes and special assessment installments payable for 2013 will be prorated by Seller and Buyer as of the Proration Date based upon a calendar fiscal year.

6.4     Other Property Operating Expenses. Operating expenses for the Property (including payments under Surviving Contracts) will be prorated as of the Proration Date regardless of when invoices for the same are received. Seller will pay all utility charges and other operating expenses attributable to the Property prior to and including the Proration Date (except for those utility charges and operating expenses payable directly by Tenants in accordance with the Resident Contracts) and Buyer will pay all utility charges and other operating expenses attributable to the Property after the Proration Date. To the extent that the amount of actual consumption of any utility services or actual cost of other operating expenses is not determined prior to the Proration Date, a proration will be made at Closing based on an estimate using the last available reading or estimate of other charges. Final post-closing adjustments and re-prorations between Buyer and Seller will be made on the Re-proration Date, which shall take place within 30 days of the Closing Date. Seller will not assign to Buyer any deposits which Seller has with any of the utility services or companies servicing the Property unless Buyer, at Buyer's option, purchases the deposits at Closing, in which event Seller will assign to Buyer all of Seller's right, title and interest in such deposits. Buyer will arrange with such services and companies to have accounts opened in Buyer's name beginning at 12:01 a.m. Central Standard Time on the Closing Date.

6.5     Apportionment Credit. In the event the apportionments to be made at the Closing result in a credit balance (i) to Buyer, such sum will be paid at the Closing by giving Buyer a credit against the Contribution Price in the amount of such credit balance, or (ii) to Seller, Buyer will adjust the number of Units based on a value of $12.00 per Unit. All revenue collected for periods prior to the Closing Date belong to Seller. Revenue collected for the period commencing on the Closing Date shall belong to the Buyer.

6.6     Attorneys' Fees. Each of the parties will pay its own attorneys' fees, except that a party defaulting under this Agreement or any Closing Document will pay the reasonable attorneys' fees and court costs incurred by the non-defaulting party in enforcing its rights regarding such default.

6.7     Other Costs. All other operating costs of the Property will be allocated between Seller and Buyer as of the Closing Date, so that Seller pays that part of such other operating costs attributable to the period before the Closing Date, and Buyer pays that part of such other operating costs attributable to the period on and after the Closing Date. Each party will pay any other costs customarily paid by such party pursuant to local practice.

7.     Title Examination. Title Examination will be conducted as follows:

7.1     Seller's Title Evidence. Seller will, as soon as possible after the Contract Date, furnish the following ("Title Evidence") to Buyer:

- 9 -

7.1.1    Title Commitment. The commitment to insure issued by Title Company ("Title Commitment"), accompanied by legible copies of all documents referenced in the Title Commitment.

7.2    Buyer's Title Objections. Within 30 days after receiving the last of the Title Evidence, Buyer will examine the title to the Property and make written objections ("Title Objections") to the form or contents of the Title Evidence. Any such item other than mortgages, assignment of leases and rents and Uniform Commercial Code financing statements (collectively referred to as "Financial Encumbrances"), which Buyer shall not object to within the time period set forth above, Buyer will be deemed to have waived its right to object. All Financial Encumbrances shall be deemed to be objected to and, unless assumed by Buyer, shall be removed prior to or at the Closing.

If Buyer gives Seller timely notice of Title Objections, Seller will use commercially reasonable efforts to cure or satisfy the Title Objections within a reasonable time, not to exceed 60 days after Seller's receipt of the Title Objections, during which period the Closing will be postponed if necessary until 5 days after Seller cures or satisfies the Title Objections. To the extent any Title Objection can be satisfied by the payment of money, Buyer has the right to apply a portion of the cash payable to Seller at the Closing to the satisfaction of the Title Objections, and the amount so applied will reduce the amount of cash payable to Seller at the Closing. If the Title Objections are not cured within the 60 day period, Buyer will have the option to do any of the following:

7.2.1    Terminate this Agreement.

7.2.2    Close the transaction and withhold from the Contribution Price an amount which, in the reasonable judgment of Title Company, is 150% of the amount sufficient to assure cure of the Title Objections. Any amount so withheld will be placed in escrow with Title Company, pending such cure. If Seller does not cure the Title Objections within 90 days after the escrow is established, Buyer may, at its option, cure the Title Objections and charge the costs of such cure (including reasonable attorney's fees) against the escrowed amount. If the escrowed proceeds are insufficient to pay the costs of curing the Title Objections, Seller will reimburse Buyer for the deficiency within 10 days after receipt of an invoice, which obligation will survive Closing. If such escrow is established, the parties will execute and deliver such documents as may be reasonably required by Title Company, and Seller will pay the charges of Title Company to create and administer the escrow.

7.2.3    Waive the Title Objections and proceed to Closing.

If Seller reasonably cures or satisfies, or undertakes to reasonably cure or satisfy, the Title Objections to the satisfaction of Buyer and Title Company, then this Agreement will continue in full force and effect. Buyer has the right at any time to waive any Title Objections that it may have made and thereby preserve this Agreement in full force and effect. Seller will not voluntarily alter or encumber in any way Seller's title to the Property after the Contract Date (except to the extent provided in Section 8), without Buyer's written consent.

8.    Operations Pending Closing.

- 10 -

Seller will, at its expense, use reasonable efforts to maintain the Property until the Closing Date or until the termination of this Agreement, whichever is earlier, substantially in its present condition, except damage by fire or other insured casualty and condemnation.

Through and including the Closing Date, Seller will, at Seller's sole cost and expense:

8.1    keep all existing insurance policies affecting the Property or any portion thereof in full force and effect;

8.2    keep in full force and effect and/or renew all Permits and Licenses, if any, pertaining to Seller's ownership or operation of the Property or any portion thereof in substantially the same manner as Seller currently maintains such Permits and Licenses;

8.3    continue to provide all services currently provided by Seller with respect to the Property or any portion thereof, and to continue to operate, manage, and maintain (including repairs and replacements) the Property in substantially the same manner as Seller currently operates, manages, and maintains (including repairs and replacements) the Property; and

8.4    keep Buyer timely advised of any repairs or improvements required to keep the Property or any portion thereof in the condition required by this Agreement, which cost in excess of $5,000.00.

Seller will give Buyer written notice of any citation or other notice which Seller receives, subsequent to the Contract Date, from any governmental authority concerning any alleged violation of any law, ordinance, code, rule, regulation or order regulating the Property or the use thereof. Seller will pay in full, prior to the Closing Date, all bills and invoices for labor, materials and services relating to the Property which are attributable to the period prior to the Closing Date, subject to Closing prorations, and which Buyer is not otherwise responsible for paying pursuant to this Agreement. From and after the Contract Date, Seller will not apply any Resident Deposit to rent due from any Tenant.

9.    Contracts. Seller will, at Seller's sole cost and expense, at or prior to the Closing, terminate all Contracts, except those Contracts, designated by Buyer within 10 days prior to the Closing Date to be Surviving Contracts, which Buyer elects to assume. Seller will pay any cost, penalty or fee associated with terminating those Contracts not designated as Surviving Contracts. Buyer will pay or reimburse Seller for any portion of the fees due for any Surviving Contracts which are attributable to the period from and after the Closing Date.

10.    Representations and Warranties by Seller. As of the Contract Date, Seller represents and warrants to Buyer as follows:

10.1    Authority. Seller is duly qualified to transact business in the State of North Dakota; Seller has the requisite power and authority to enter into and perform this Agreement and those Seller's Closing Documents to be signed by it; this Agreement and such documents have been duly authorized by all necessary action on the part of Seller and have been or will be as of the Closing Date, as applicable, duly executed and delivered; such execution, delivery and performance by Seller of such documents do not conflict with or result in a violation of Seller's

- 11 -

governing documents, or any judgment, order, or decree of any court or arbiter to which Seller is a party; such documents are valid and binding obligations of Seller, and are enforceable in accordance with their terms.

10.2    Title to Land and Improvements. Seller owns the Land and Improvements, free and clear of all encumbrances except the Permitted Title Exceptions.

10.3    Title to Personal Property and Intangible Property. Seller owns the Personal Property free and clear of all encumbrances, except those that will be discharged on or before the Closing Date.

10.4    Contracts. A complete and accurate list of the Contracts is attached hereto as Exhibit E. Seller has made available to Buyer a correct and complete copy of the Contracts and their amendments. The Contracts are in full force and neither Seller, nor to the best knowledge of Seller, any other party to the Contracts, is in default under the Contracts. All other Contracts in effect regarding the Property are terminable on or before the Closing Date. Seller has not received any notice of default under any Contracts which remains uncured.

10.5    Permits and Licenses. A complete and accurate list of Permits and Licenses is attached hereto as Exhibit B. Seller has made available to Buyer a correct and complete copy of the Permits and licenses, including Permits relating to Hazardous Substances, and their amendments. The Permits and Licenses are in full force and effect, and to the best knowledge of Seller, Seller is not in default under the Permits or Licenses. No other Permits or Licenses are required from any governmental entity in order to operate the Property as it is now operated. Seller has not received any notice of default under or any violation of any Permits or Licenses which remains uncured. The Permits and Licenses constitute all Permits and Licenses required for the occupancy of the Property and the operation of the Improvements as the Property is now being occupied and operated.

10.6    Utilities. All water, sewer, electric, natural gas, telephone, telecommunications, and drainage facilities, and other utilities required for the current operation of the Property are installed to the Property and are connected with valid permits. All utility lines serving the Property are located within the boundaries of the Property, within lands dedicated to public use, or within recorded easements for such purpose. Seller has not received any notice of actual or threatened reduction or curtailment of any utility service now supplied to the Property.

10.7    Certificates of Occupancy. Seller has not received any notice of actual or threatened cancellation or suspension of any certificates of occupancy for any portion of the Property.

10.8    Taxes and Assessments. The Land is not subject to or affected by any special assessment for public improvements or otherwise, except as disclosed in public records, whether or not presently a lien upon the Land. Seller has not made any commitment to any governmental authority, utility company, school board, church or other religious body, homeowner or homeowner's association or any other organization, group or individual relating to the Property which would impose an obligation upon Seller or its successors or assigns to make any contributions or dedications of money or land, or to construct, install or maintain any

improvements of a public or private nature as part of the Property or upon separate lands. No federal, state or local taxing authority has asserted any tax deficiency, lien, interest or penalty, special assessment or other assessment against the Property or Seller which has not been paid; and there is no pending audit or inquiry from any federal, state or local taxing authority or other matter relating to the Property or Seller of which Seller has received notice which reasonably may be expected to result in a tax deficiency, lien, interest, penalty, special assessment or other assessment against the Property or Seller.

10.9    Environmental Laws. Seller and the Property have been and are in compliance in all material respects with applicable Environmental Laws. There is and has been no civil or criminal litigation, written notice of violation, order, demand, allegation, citation, directive, summons, penalty, fine or liability arising under any Environmental Law (collectively, "Environmental Notices") during the period of time that Seller has owned the Property, or to the best of Seller's knowledge, prior thereto, and Seller, and the Property have not been the subject of any administrative proceeding, investigation or information request relating to any Environmental Law or Environmental Matter. Seller and the Property are in compliance with those Permits and Licenses required under Environmental Law to operate the Property as currently operated by Seller, and no such Permits and Licenses or other approvals will be required, revoked, terminated or not renewed as a result of the transactions contemplated by this Agreement. Seller has not used, handled, generated, produced, manufactured, treated, stored, disposed of, recycled or transported any Hazardous Substances on, under, about, to or from the Property (or any other property) in violation of any Environmental Law. To the best of Seller's knowledge, there is and has been no Release or threatened Release of any Hazardous Substances on, in, at, under or from the Property or from any real property impacting the Property and there are no asbestos-containing materials or PCBs located on the Property and no such materials have been removed or abated. To the best of Seller's knowledge there are no past or present events, conditions, circumstances, activities, practices, incidents, actions or plans of Seller, either collectively, individually or severally, which reasonably would be expected to prevent continued compliance with any Environmental Laws, or which reasonably would be expected to give rise to any Environmental Matter or would reasonably be expected to require a material expenditure by Buyer with respect to compliance with any Environmental Law or any Environmental Matter. There are no liens or assessments relating to any Environmental Matter against Seller or the Property.

10.10    Reports. Seller has made available to Buyer copies of all Reports which Buyer requested and which are in the possession of Seller.

10.11    No Rights to Purchase. Seller is the sole owner of the Property and, no person, other than Buyer, has any right, agreement, commitment, option, right of first refusal or any other agreement, whether oral or written, with respect to the purchase, assignment or transfer of all or any portion of the Property (other than the rights of Tenants to lease portions of the Property, as Tenants only, pursuant to the Leases). To the best knowledge of Seller, no party other than Buyer has or claims any unrecorded or undisclosed legal or equitable interest in the Property.

10.12    Seller's Defaults. Seller is not in default concerning any of its obligations or liabilities regarding the Property.

- 13 -

10.13  Non-Foreign Status.  Seller is not a "foreign person," "foreign partnership," "foreign trust" or "foreign estate" as those terms are defined in Section 1445 of the Internal Revenue Code of 1986, as amended and the regulations promulgated thereto.

10.14  Use of Property.  The Property is usable for its current uses without violating any federal, state, local or other governmental building, zoning, health, traffic, environmental, flood control, fire, safety, platting, subdivision or other law, ordinance or regulation, or any applicable private restriction, and such use is a legal conforming use.

10.15  Condition.  To the best knowledge of Seller, the buildings, structures and improvements included within the Property are structurally sound and in good repair and in first-class condition, and all mechanical, electrical, heating, air conditioning, drainage, sewer, water and plumbing systems are in proper working order.

10.16  Prorations.  The information to be furnished by Seller on which the computation of prorations is based will be true, correct and complete in all material respects.

10.17  Warranties.  The Warranties made available to Buyer pursuant to Section 4.1.5, if any, are complete and accurate and are in full force and effect in accordance with their respective terms.

10.18  No Litigation.  Seller has not received notice of (a) any actual or pending litigation or proceeding by any organization, person, individual or governmental agency against Seller with respect to the Property or against the Property, (b) any violation of the Property's compliance with applicable fire or life safety laws, building code ordinances, zoning ordinances or any similar statutes, ordinances, laws, rules or regulations, (c) any condition, defect or inadequacy which, if not corrected, would result in the termination of, or increase in the cost of, insurance coverage, (d) any proceedings which could cause the change, redefinition or other modification of the zoning classifications or of other legal requirements applicable to the Property or any part thereof, or (e) any pending or threatened condemnation proceeding that would affect the Property.

10.19  Boundary Lines of Land.  There is no pending litigation and Seller has no knowledge nor has Seller received notice of any dispute concerning the location of the lines and corners of the Land, and Seller has not been served with any legal action concerning the location of the lines and corners of the Land.

10.20  Compliance with Laws.  Seller has complied with and is not in default under, or in violation of any laws, ordinances, rules, regulations or orders (including without limitation any safety, health laws, ordinances, rules, regulations or orders) applicable to the Property for which the failure to comply would have a Material Adverse Effect on Seller or the Property.

10.21  Financial Statements.  Seller has delivered to Buyer statements of operation for the Property for the three most recently completed fiscal years of Seller, and shall provide to Buyer a statement of operations for the most recent month end prior to the Execution Date.  All financial statements present fairly the financial condition and results of operations of the Property at the dates and for the periods presented, subject, in the case of statements other than for fiscal years, to normal year-end adjustments.  Except, as set forth in the financial statements,

- 14 -

or in the other schedules to this Agreement, Seller has no obligation or liability of any nature (whether accrued, absolute, contingent or otherwise) that is material or that, when combined with all other such obligations or liabilities, would be material to the business, operations, prospects, properties or assets, or condition, financial or otherwise, of the Property.

10.22  Material Adverse Changes.  Since the date of the most recent financial statement delivered to Buyer in accordance with Section 10.21 above, there has not been (i) any Material Adverse Change in the financial condition or in the operations, business, or prospects of the Property; (ii) any damage, destruction or loss, whether covered by insurance or not, materially and adversely affecting the operations of the Property; or (iii) any material complaints or other concerns which have been brought to the attention of Seller and which relate to the Property.

10.23  Insurance.  Seller has had in effect since the completion of the Property, and presently has in effect, all insurance appropriate for the activities carried on at the Property, including liability and property insurance, which policies are valid and enforceable in accordance with their terms.

10.24  Update by Seller.  As part of the Closing, Seller shall give Buyer written notice of any updates to any of Seller's representations and/or warranties set forth in this Agreement promptly after Seller has knowledge of the facts or circumstances giving rise to the update.  Any update delivered by Seller to Buyer shall be deemed a Material Adverse Change and Buyer shall have the right to terminate this Agreement.  If Buyer elects not to terminate this Agreement, any update delivered by Seller to Buyer shall amend Seller's representations and/or warranties set forth in this Agreement and Seller shall not be in default of their representations and/or warranties relating to the updates.

10.25  Miscellaneous.  It is a condition of Closing that the representations and warranties contained in this Section 10 are true and correct at Closing and Seller will reaffirm these representations and warranties at Closing in the Bring-Down Certificate required by Section 5.1.5.  In the event that Seller or Buyer learns that any of said representations or warranties becomes inaccurate between the Contract Date and the Closing Date, Seller or Buyer will immediately notify the other party in writing of such change.  If such change is adverse to Buyer, Seller will then use its good faith efforts to cure such change after giving or receiving notice thereof as required herein and the Closing will be automatically postponed for up to 30 days in order to allow Seller to cure such change.  In the event Seller so cures such change within such 30 day period, the Closing Date will be the date 5 days after Seller cures the change.  If Seller is unable to cure such change within such 30 day period, Buyer may either (a) terminate this Agreement by written notice to Seller, and the parties will have no further rights or obligations hereunder, except for those which expressly survive such termination, or (b) waive such right to terminate and proceed with the transaction pursuant to the remaining terms and conditions of this Agreement.  In the event Buyer elects option (b) in the preceding sentence or in the event Buyer elects to close with the knowledge that a representation or warranty of Seller herein which was the subject of a notice pursuant to this Section 10.25 is untrue or incorrect, such representation and warranty will be deemed to be automatically amended to reflect such change.  The representations and warranties contained in this Section 10 will survive the Closing.

Seller will indemnify Buyer, its successors and assigns, against, and will hold Buyer, its successors and assigns, harmless from, any expenses or damages, including reasonable attorneys' fees and remediation costs, that Buyer incurs because of the breach of any of the above representations and warranties contained in this Section 10, whether such breach is discovered before or after Closing.

Except as provided in this Section 10.25, consummation of this Agreement by Buyer with knowledge of any such breach by Seller will not constitute a waiver or release by Buyer of any claims due to such breach.

11.     Representations and Warranties by Buyer.  Buyer represents and warrants to Seller that Buyer is duly formed and is in good standing under the laws of the State of    North Dakota; that Buyer is duly qualified to transact business in the State of North Dakota; that Buyer has the requisite power and authority to enter into this Agreement and Buyer's Closing Documents signed by it; this Agreement and such documents have been, or will be as of the Closing Date, as applicable, duly authorized by all necessary action on the part of Buyer and have been, or will be as of the Closing Date, as applicable, duly executed and delivered; that the execution, delivery and performance by Buyer of such documents do not conflict with or result in violation of Buyer's governing documents or any judgment, order or decree of any court or arbiter to which Buyer is a party; such documents are valid and binding obligations of Buyer, and are enforceable in accordance with their terms.   The representations and warranties contained in this Section 11 will survive the Closing.  Buyer will indemnify Seller, its successors and assigns, against, and will hold Seller, its successors and assigns, harmless from, any expenses or damages, including reasonable attorneys' fees, that Seller incurs because of the breach of any of the above representations and warranties, whether such breach is discovered before or after Closing.  Consummation of this Agreement by Seller with knowledge of any such breach by Buyer will not constitute a waiver or release by Seller of any claims due to such breach.

12.     Conditions to Closing.  Buyer's obligation to proceed to Closing under this Agreement is subject to the following conditions precedent:

12.1    Seller will have performed and satisfied each and all of Seller's obligations under this Agreement;

12.2    Each and all of Seller's representations and warranties set forth in this Agreement will be true and correct on the Contract Date and on the Closing Date;

12.3    There will be no Material Adverse Change between the Contract Date and the Closing Date in the physical or financial condition or profitability of the Property or in Seller's obligations with respect thereto;

12.4    Buyer shall have completed its inspection of the Property and shall be satisfied with the results; and

12.5    Seller will deliver title to Buyer in condition that enables the Title Company to deliver the Title Policy in accordance with Section 1.1.37.

- 16 -

In the event any of the foregoing conditions are not satisfied on the Closing Date, as the same may have been postponed pursuant to the terms of this Agreement, Buyer will have no obligation to proceed to Closing and, unless Buyer delivers written notice to Seller that Buyer has waived any unsatisfied condition and will proceed to Closing, this Agreement, upon notice from Buyer to Seller, will cease and terminate. Notwithstanding the foregoing, nothing contained herein will waive or diminish any right or remedy Buyer may have for Seller's default or breach of this Agreement.

13. Damage. If, prior to the Closing, all or any part of the Property is substantially damaged by fire, casualty, the elements or any other cause, Seller will immediately give notice to Buyer of such fact and, at Buyer's option (to be exercised within 30 days after Seller's notice), this Agreement will terminate, in which event neither party will have any further obligations under this Agreement. If Buyer fails to elect to terminate this Agreement despite such damage, or if the Property is not substantially damaged, Seller will promptly repair such damage or destruction and return the Property to its condition prior to such damage; or at Buyer's option, Seller will assign to Buyer all of Seller's rights to receive the proceeds of all insurance related to such damage, the transaction will close, and the Purchase Price will remain the same. If such damage is completely repaired prior to the Closing, then there will be no reduction in the Purchase Price and Seller will retain the proceeds of all insurance related to such damage. If such damage is not completely repaired prior to the Closing, but Seller is diligently proceeding to repair, then Seller will complete the repair after the Closing and will be entitled to receive the proceeds of all insurance related to such damage after repair is completed; provided, however, Buyer will have the right to postpone the Closing until repairs are completed. If Seller fails to diligently proceed to repair such damage, then Buyer has the right to require the Closing to occur and the Purchase Price (and specifically the cash portion payable at the Closing) will be reduced by the cost of such repair, or at Buyer's option, Seller will assign to Buyer all of Seller's rights to receive the proceeds of all insurance related to such damage, and the Purchase Price will remain the same. For purposes of this Section, the words "substantially damaged" mean damage that is reasonably estimated to cost $100,000 or more to repair.

14. Condemnation. If, prior to the Closing, eminent domain proceedings are commenced against all or any material part of the Property, Seller will immediately give notice to Buyer of such fact, and at Buyer's option (to be exercised within 30 days after Seller's notice), this Agreement will terminate, in which event neither party will have further obligations under this Agreement. If Buyer fails to give such notice then there will be no reduction in the Purchase Price, and Seller will assign to Buyer at the Closing all of Seller's right, title and interest in and to any award made or to be made in the condemnation proceedings. Prior to the Closing, Seller will not designate counsel, appear in, or otherwise take any action with respect to the condemnation proceedings without Buyer's prior written consent.

15. Broker's Commission. Seller and Buyer represent and warrant to each other that they have dealt with no other brokers, finders or the like in connection with this transaction, and will indemnify each other and hold each other harmless against all claims, damages, costs or expenses of or for any other such fees or commissions resulting from the actions or agreements of the indemnitor regarding the execution or performance of this Agreement, and will pay all costs of defending any action or lawsuit brought to recover any such fees or commissions incurred by the other party, including reasonable attorney's fees.

16.    Mutual Indemnification. Seller will indemnify and hold Buyer harmless from all liabilities (including reasonable attorneys' fees in defending against claims) arising out of claims by third parties relating to acts or occurrences on, at or with respect to the Property which occur prior to the Closing, unless such claims relate to acts by Buyer or its agents.  Buyer will indemnify and hold Seller harmless from all liabilities (including reasonable attorneys' fees in defending against claims) arising out of claims by third parties relating to acts or occurrences on, at or with respect to the Property which occur on or after the Closing unless such claims relate to acts by Seller or its agents.

17.    Assignment.

17.1    Assignment by Buyer. Buyer will have the right to assign or transfer all or any part of its right in this Agreement to an affiliated party. Upon such assignment, the assignee will have and be subject to all the rights, benefits, duties and obligations of Buyer hereunder, but Buyer will not be released from any liability or obligation of Buyer hereunder unless Seller consents to such release in writing.

17.2    Assignment by Seller. Seller will have the right to assign or transfer all or any part of its right in this Agreement. Upon such assignment, the assignee will have and be subject to all the rights, benefits, duties and obligations of Seller hereunder, but Seller will not be released from any liability or obligation of Seller hereunder unless Buyer consents to such release in writing.

18.    Survival. All of the terms of this Agreement will survive the Closing.

19.    Notices. To be effective, any notice required or permitted hereunder must be given in one of the following manners:  (i) by personal delivery upon an authorized representative of a party hereto; (ii) by United States registered or certified mail, return receipt requested, postage prepaid; (iii) by transmission by facsimile or email followed by notice by certified mail or overnight courier; or (iv) by deposit cost paid with a nationally recognized overnight courier; in all cases properly addressed as follows:

> If to Seller:  McEnroe Place, LLC
> Attn:  Kevin Ritterman
> 615 1st Avenue North, Ste. A
> Grand Forks, ND 58208-4010
> Fax #: (701) 772-2654
> Email: kritterman@dakotacommercial.com
>
> If to Buyer:  Edgewood Properties, LLLP
> Attn:  Philip Gisi
> 322 Demers Avenue, Suite 500
> PO Box 13336
> Grand Forks, ND  58208-3336
> Fax #:  (701)335-7190
> Email:  philg@cdgewoodmail.com

Notices will be deemed effective on the date of personal delivery, mailing, transmission or deposit, as provided above; provided, however, that if notice is given by mailing or deposit, the time for response to any notice by the other party will start running one business day after any such mailing or deposit. Any party may change its address for the service of notice by giving notice of such change 10 days prior to the effective date of such change.

20.    Miscellaneous.

20.1    Captions. The paragraph headings or captions appearing in this Agreement are for convenience only, are not a part of this Agreement and are not to be considered in interpreting this Agreement.

20.2    Entire Agreement; Modification.    This written Agreement constitutes the complete agreement between the parties and supersedes any prior oral or written agreements between the parties regarding the Property. There are no oral agreements that change this Agreement and no waiver of any of its terms will be effective unless in a writing executed by the parties.

20.3    Controlling Law. This Agreement has been made under the laws of the State of North Dakota, and such laws will control its interpretation.

20.4    No Waiver. Neither the failure of either party to exercise any power given such party hereunder or to insist upon strict compliance by the other party with its obligations hereunder, nor any custom or practice of the parties at variance with the terms hereof constitutes a waiver of either party's right to demand exact compliance with the terms hereof.

20.5    Binding Effect. This Agreement is binding upon and inures to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns, subject to the provisions of Section 18.

20.6    Amendments. No amendment to this Agreement will be binding on either of the parties hereto unless such amendment is in writing and is executed by the party against whom enforcement of such amendment is sought.

20.7    Resident Deposit. At Closing, Seller shall provide Buyer with an accounting of all security deposits and other refundable deposits received from past, current or prospective residents of the Property that have not yet been refunded to such residents as of the Closing Date (the "Resident Deposits"). Such accounting shall set forth the names of the residents or prospective residents for whom such funds are held, the amounts held on behalf of each resident or prospective resident and the Seller's warranty that the accounting is true, correct and complete. On the Closing Date Seller shall transfer the Resident Deposits to the bank accounts designated by Buyer and Buyer shall assume the financial and custodial obligations with respect thereto. Notwithstanding the foregoing, Seller will indemnify and hold Buyer harmless from all liabilities, claims and demands in the event the amount of the Resident Deposits transfer to the Buyer's bank account did not represent the full amount of such Resident Deposits then or thereafter shown or have been delivered to Seller by the current residents or the prospective residents of the Property.

- 19 -

20.8    Date For Performance. If the time period by which any right, option or election provided under this Agreement must be exercised, or by which any act required hereunder must be performed, or by which the Closing must be held, expires on a Saturday, Sunday or legal or bank holiday, then such time period will be automatically extended through the close of business on the next regularly scheduled business day.

20.9    Recording. Seller and Buyer will not record this Agreement or a short-form or memorandum of this Agreement without the consent of the other party.

20.10   Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original, but all of which, when taken together, constitute the same instrument.

20.11   Time of the Essence. Time is of the essence of this Agreement and each and every term and condition hereof.

20.12   Severability. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations, and is intended, and will for all purposes be deemed to be, a single, integrated document setting forth all of the agreements and understandings of the parties hereto, and superseding all prior negotiations, understandings and agreements of such parties. If any term or provision of this Agreement or the application thereof to any person or circumstance is, for any reason and to any extent, held to be invalid or unenforceable, then such term or provision will be ignored, and to the maximum extent possible, this Agreement will continue in full force and effect, but without giving effect to such term or provision.

21.     Default and Remedies.

21.1    Buyer's Default. If Buyer defaults under this Agreement, Seller will have the right to terminate this Agreement. The termination of this Agreement will be the sole remedy available to Seller for default by Buyer, and Buyer will not be liable for damages or specific performance. Seller and Buyer acknowledge and agree that any liability of Buyer to Seller under the indemnity provided for in Section 4.2 hereof will not be limited by this liquidated damages provision.

21.2    Seller's Default. If Seller defaults under this Agreement, Buyer will have the right to terminate this Agreement by giving written notice of termination to Seller, whereupon this Agreement will terminate. In addition to terminating this Agreement, Buyer may sue Seller for damages. In lieu of terminating this Agreement, Buyer may maintain a suit for specific performance of this Agreement.

*[Remainder of page intentionally left blank; signature page follows.]*

- 20 -

Seller and Buyer have executed this Agreement as of the date first written above.

MCENROE PLACE, LLC

By: _____
Kevin Ritterman
Its:    President

SELLER

EDGEWOOD PROPERTIES, LLLP

By: _____
Philip Gisi
Its:    President  Treasurer

BUYER

5470359_1.doc

- 21 -

**EXHIBIT A**
**LEGAL DESCRIPTION OF LAND**

Lot A, Block 1, McEnroe Second Resubdivision to the City of Grand Forks, North Dakota

**EXHIBIT B**
**LIST OF PERMITS AND LICENSES**

None.

EXHIBIT C
LIST OF PERSONAL PROPERTY

Apartment unit appliances

EXHIBIT D
LIST OF PLANS

EXHIBIT E
LIST OF CONTRACTS

EXHIBIT F

ASSIGNMENT AND ASSUMPTION AGREEMENT

William P. Harrie*
Mark R. Hanson* •
Andrew L.B. Noah
Jacqueline S. Anderson*
Thaddeus E. Swanson*



*Cloe A. Kilwein
*Anthony J.R. Anderson
Nicholas Mino
Matthew A. Costello

Douglas W. Gigler, Retired

*Also Licensed in Minnesota
• Also Licensed in South Dakota

December 27, 2023

# EXHIBIT 2

**VIA E-MAIL ONLY**

Sophie Quinn                                             **Sophie.quinn@selective.com**
Selective Insurance Company of America
P.O. Box 7264
London, KY 40742

Kristi K. Brownson                                       **kbrownson@BrownsonPLLC.com**
Managing Shareholder
Brownson PLLC
225 South Sixth Street – Ste. 4800
Minneapolis, MN 55402

Re:    Your Insured: Edgewood Properties LLLP
       Your Claim No: 21997755
       Your Policy No.: MP0082002000056
       Client/Insured: Dakota Commercial & Development Co.
       Insurer: Farmers Union Insurance
       Farmers Union Insurance Claim No.: 2023-100383
       Date of Loss: June 8, 2019
       Loss Location:  EVI McEnroe Apartments, LLC, Grand Forks, ND; EVI Campus Place
       Apartments, Grand Forks, ND; EVI Mandan Apartments, LLC, Mandan, ND
       Claimants:  Edgewood Properties LLLP; EVI McEnroe Apartments, LLC; EVI Campus
       Place, LLC; and EVI Mandan Apartments, LLC
       Our File No.: 01036.010

Dear Sophie and Kristi:

As you know, I have been retained by Farmers Union Mutual Insurance Company ("FUMIC"),
which insures Dakota Commercial & Development Co. We had previously tendered the defense of
personal injury lawsuits brought by Paul Anderson, Elijah Hylden, Amanda Seim, Steven Thompson
and Benjamin Thompson arising out of an accident that occurred on June 8, 2019 following the
collapse of a balcony on the fourth story of the apartment complex owned by EVI McEnroe, of
which Edgewood REIT is the sole owner. The lawsuit included claims made against FUMIC
policyholder Dakota Commercial & Development Co. I am enclosing a copy of my April 2, 2020,
tender of defense letter, as well as my February 12, 2021 tender of defense letter. As you may recall,
in *Farmers Union Mutual Insurance Company vs. Mesa Underwriters Specialty Insurance Company*,
Civil No. 18-2021-CV-02368, Judge Don Hager, Judge of the Grand Forks County District Court in

Sophie Quinn / Kristi Brownson
December 27, 2023
Page 2

North Dakota, issued an Order Granting Plaintiff's Motion for Summary Judgment. As a result of that ruling, MUSIC was obligated to pay all past and future defense costs and fees incurred by Dakota Commercial.

Subsequently, we were advised by Kristi Brownson that MUSIC had not only exhausted its policy limits of $1M, but MUSIC's policy has a termination provision regarding the duty to defend. According to Kristi Brownson's e-mail to me dated June 17, 2022, the defense duty ended when the Mesa policy limits were exhausted.

Since that time, Edgewood Properties has filed a lawsuit against Dakota Commercial and others alleging that six apartment complexes owned by Edgewood in Grand Forks, ND and Mandan, ND were improperly designed and constructed and that Edgewood was required to spend substantial amounts to remediate and repair allegedly defective balconies on the six apartment complexes. I am enclosing a copy of the Amended Complaint from this property damage litigation. Edgewood Properties alleges in the Amended Complaint that Dakota Commercial was negligent or otherwise at fault regarding the development, design, construction, and management of the six apartment buildings involved in the lawsuit, that resulted in building defects, and remediation costs and expenses to repair and replace the defective balconies on all of the apartment buildings.

FUMIC is defending the Amended Complaint and lawsuit against Dakota Commercial under a Reservation of Rights. Coverage counsel retained by FUMIC, Mike Morley of Grand Forks, has concluded that the claims made in the Amended Complaint by Edgewood Properties constitute a separate "occurrence," thereby triggering a separate coverage limit. If coverage counsel for FUMIC is correct, and we have no reason to believe that his legal analysis is not correct, then MUSIC would similarly have an obligation to defend and indemnify up to its policy limit which provides each occurrence limits of $1M and general aggregate liability limits of $2M.

As a result, on behalf of both FUMIC and Dakota Commercial, we are hereby tendering the handling and defense of the above-entitled lawsuit brought against Edgewood Properties over to Edgewood Properties. We are requesting that Mesa Underwriters Specialty Insurance Company, as the insurer of Edgewood Properties LLLP defend and indemnify Dakota Commercial & Development Co. in the above-entitled lawsuit.

Please respond to this tender of defense within 15 days of the date of this letter. If we have not heard from you by that time and the tender of defense has not been accepted, we intend to file a separate declaratory judgment action to enforce the defense and indemnity obligations. We look forward to hearing from you. Thank you.

Sincerely,

William P. Harrie
wharrie@nilleslaw.com
/rdh



Greg Shaw
Direct Line:  (973)948-9262
Claims Fax:  (877)233-1354
Greg.Shaw@selective.com

June 11, 2024

# EXHIBIT 3

**JUN 1 7 2024**

William P. Harrie, Esq.
Niles Lawyers
1800 Radisson Tower
201 N. 5th Street
Fargo, ND 58108-2626
wharrie@nilleslaw.com

Re:   Insured:        Edgewood Properties LLLP

      Claimants:      Edgewood Properties LLLP; EVI McEnroe Apartments, LLC; EVI
                      Campus Place, LLC; and EVI Mandan Apartments, LLC
                      (collectively, "Edgewood")

      Your clients:   Dakota Commercial & Development Co. ("Dakota") and Farmers
                      Union Mutual Insurance Company ("FUMIC")

      Our Claim #:    22575076

      Your Claim #:   2023-100383

      Date of Loss:   June 8, 2019

      Policy #:       MP0082002000056 - July 26, 2018 to July 26, 2019 (the "MUSIC
                      Policy")

Dear Mr. Harrie:

      We acknowledge receipt of your letter of January 3, 2024, tendering to Mesa Underwriters
Specialty Insurance Company ("MUSIC") the handling and defense, on behalf of Dakota and
FUMIC, of the lawsuit filed by Edgewood against Dakota and others in an action styled *Edgewood*

---

Claims Department
PO Box 7264, London, KY  40742

*Properties, LLLP, et al. v. Community Contractors, Inc., et al.* in North Dakota District Court, Case No. 18-2023-CV-1677 (the "Edgewood Action").

As you know, certain claimants had brought a prior action against Dakota (and others) for bodily injuries those claimants suffered resulting from the collapse of a balcony at an apartment complex owned by Edgewood (the "Personal Injury Litigation"). In a prior declaratory judgment action brought by FUMIC against MUSIC relating to the MUSIC Policy (Civil No. 18-2021-CV-02368) (the "Declaratory Judgment Action"), the court determined that Dakota qualified as an insured under the MUSIC Policy with respect to the duty to defend claims asserted in the Personal Injury Litigation to the extent allegations in the Personal Injury Litigation were made against Dakota as a property manager for the Edgewood properties at issue. Accordingly, solely for purposes of your tender, this letter applies the ruling that Dakota qualifies as an insured under the MUSIC Policy to the extent that the Edgewood Action includes allegations against Dakota as a property manager for the Edgewood properties.

However, even applying the decision in the prior Declaratory Judgment action, based upon review of the Amended Complaint in the Edgewood Action, there is no possibility of coverage under the MUSIC Policy for the claims asserted against Dakota in the Edgewood Action. Accordingly, MUSIC has no obligation to defend or indemnify Dakota with regard to the claims asserted in the Edgewood Action, and MUSIC therefore denies your request that MUSIC assume the defense of Dakota in the Edgewood Action. For the avoidance of doubt, MUSIC also disclaims any obligation to indemnify Dakota for any damages sought in the Edgewood Action.

## FACTUAL BACKGROUND

As you know, the Personal Injury Litigation brought by the claimants against both Edgewood and Dakota was ultimately settled. In connection with that settlement, MUSIC paid the full $1,000,000 per occurrence limit available under the MUSIC Policy.

In the Edgewood Action, Edgewood purports to seek damages against, *inter alia*, Dakota in the form of damages for payment of third-party claims, including expenses and attorney's fees (*i.e.*, the defense and settlement of the Personal Injury Litigation ) and for remediation of the defectively constructed properties along with "diminution in value, lost rent, lost revenue, and lost income, along with other damages and expenses. *See, e.g.*, Amended Complaint at ¶ 86.

The Amended Complaint asserts eight causes of action. Only one of the causes of action is expressly pled against Dakota as property manager. *See* Count VIII (Breach of Contract – Dakota as Property Manager). One cause of action is pled against Dakota without specifying its role. *See* Count VII (Fraud N.D.C.C. § 9-03-08 and Deceit N.D.C.C. § 9-10-02). The other two causes of action pled against Dakota are based on its role as developer of the properties. *See* Count III (Negligence – Community and Dakota as Developers); Count IV (Breach of Warranty – Community and Dakota as Developers).

The Amended Complaint alleges that defendant Community Contractors, Inc. ("Community") and Dakota "developed each of the six Apartment Complexes at issue in this Action." Amended Complaint at ¶ 14. Edgewood alleges that the design and construction of the Apartment Complexes was defective and unsafe:

2

> The design and construction, including the use of untreated and inadequate wood supports, the use of lag bolts, the failure to prevent water infiltration, the failure to have supporting structures made of materials other than wood, and other errors and omissions created an unsafe condition with respect to all of the balconies at all six Apartment Complexes.

*Id.* at ¶ 25. The Amended Complaint alleges that the collapse of the balcony that resulted in the Personal Injury Litigation was caused by this defective design and construction.

The Amended Complaint also alleges that the defective design and construction also caused the need for remediation of the properties:

> The limited engineering and architectural input, oversight, planning, and construction of the balcony where the accident took place and of the other balconies at the six Apartment Complexes were inadequate, negligent, and not in accord with applicable industry standards or building codes. Such errors and omissions created an unsafe condition leading to the June 8, 2019, accident. Such errors and omissions have required that substantial remedial measures be taken to insure the safety of the other, similarly constructed balconies and, accordingly, the safety of the residents of the Apartment Complexes. Those direct costs exceed $10 million.

*Id.* at ¶ 28.

None of these allegations regarding the design and construction of the Apartment Complexes relates to Dakota as property manager.

The Amended Complaint does allege that Dakota served as the property manager for "five of the six Apartment Complexes through a Property Management Agreement with Community from the time of construction through to April 1, 2013." *Id.* at ¶ 36. On April 1, 2013, Community and Dakota (through certain LLC's that they created) sold the Apartment Complexes to Edgewood. *Id.* at ¶ 31. Dakota then served as the property manager for five of the six Apartment Complexes from April 1, 2013 through November 2018. *Id.* at ¶ 38.

The Amended Complaint alleges that, both as the developer of the properties and as the property manager, Dakota was aware of the defective construction and unsafe condition of the balconies at the properties, but failed to disclose that knowledge to Edgewood:

> Through written discovery and depositions conducted in the Personal Injury Litigation, Edgewood was made aware there were repairs made by Community and known to Dakota to reattach loose balconies on one or more of the six Apartment Complexes, prior to April, 2013.

> Through discovery in the Personal Injury Litigation, Dakota produced documents, including work orders, for repairs to balconies on the McEnroe complex completed in March 2017. Dakota's work order

3

disclosed that in October 2016, a tenant was standing on the balcony and the balcony shifted forward, away from the building. The balcony could now be moved back and forth. A repair of that balcony was again arranged by Dakota. Dakota retained Community to make all balcony repairs where balconies were loose and needed to be reattached.

\* \* \*

In summary, both Community and Dakota were involved from the outset with the construction of the six Apartment Complexes. Both were aware of the design used for the balconies and the balcony support system. Neither obtained sufficient architectural or engineering services regarding the balconies or the support of same. Both became aware of at least one loosening balcony in 2012.

\* \* \*

Community and Dakota had actual knowledge prior to the sale of the six Apartment Complexes in April, 2013, of the defective balcony design and construction. All six of Apartment Complexes, contained the same limited engineering and architectural input, oversites, planning and construction defects. Additional balcony failures after April 1, 2013, confirmed the defective construction and design.

*Id.* at ¶¶ 39-40, 44, 49.

On the one count of the Amended Complaint directed at Dakota as property manager, Edgewood alleges that Dakota's failure to disclose what it knew about the defective design and construction of the balconies breached its obligations under the Property Management Agreement between Edgewood and Dakota and prevented Edgewood from remediating the balcony prior to the accident that resulted in the Personal Injury Litigation:

> Dakota breached Article 6 and Article 7 of the Property Management Agreement with Edgewood, as a result of its failure to notify Edgewood of the deteriorating, unsafe, and defective balconies that it had actual knowledge of from 2012 through to November 2018. Dakota also failed to satisfy its contractual duties by not further investigating the unsafe conditions of which it became aware.

> Dakota's breach of its contractual and fiduciary obligations under Article 6 of the Property Management Agreement, resulted in Edgewood's lack of knowledge and inability to immediately remediate the deteriorating balconies including the unsafe balcony which detached from the building, resulting in the Personal Injury Litigation.

*Id.* at ¶¶ 90-91.

4

## COVERAGE POSITION

We base our coverage position on our review of the MUSIC Policy's provisions in conjunction with the allegations of the Edgewood Action and our investigation. Below we have set forth policy provisions which apply to the circumstances surrounding the Edgewood Action and relate to our coverage position.

Based on careful review of the Amended Complaint and of the Policy, it is clear that there is no possibility of coverage under the MUSIC Policy for Dakota in the Edgewood Action. As explained below, the allegations in the Edgewood Action do not fall within the scope of the relevant Insuring Agreement under the MUSIC Policy, and/or, to the extent they allege bodily injury or property damage, such claims are otherwise clearly excluded under the MUSIC Policy.

Initially, we note that your tender letter stated: "Coverage counsel retained by FUMIC, Mike Morley of Grand Forks, has concluded that the claims made in the Amended Complaint by Edgewood Properties constitute a separate 'occurrence,' thereby triggering a separate coverage limit." We have not been provided with anything to support the assertion that the claims in the Edgewood Action constitute a separate occurrence from the claims resolved in the Personal Injury Litigation. Indeed, we note that even your tender identifies the same date of loss for both. We reserve all rights with respect to this issue. Nevertheless, even assuming that the property-related claims in the Edgewood Action constitute a separate occurrence, there is still no possibility of coverage under the MUSIC Policy.

The Policy's relevant Insuring Agreement provides:

## SECTION I – COVERAGES
## COVERAGE A – BODILY INJURY AND PROPERTY
## DAMAGE LIABILITY

### 1. Insuring Agreement

    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

        (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

5

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

b.  This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c.  "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d.  "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

6

    c.   Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

* * *

The MUSIC Policy defines "property damage" as:

17. "Property damage" means:
    a.   Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
    b.   Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it. For the purposes of this insurance, electronic data is not tangible property.

The MUSIC Policy further provides, on page 1 of the CG 00 01 04 13 form:

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** Who Is An Insured.

The MUSIC Policy's Who Is An Insured section provides, in relevant part:

1. If you are designated in the Declarations as:
*    *    *
    b.   A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

*    *    *

2. Each of the following is also an insured:

7

a.  Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

*     *     *

b.  Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

Based on the Insuring Agreement, the definition of "property damage," and other provisions in the MUSIC Policy, there is no possibility of coverage for the claims against Dakota in the Edgewood Action, as explained below

**First,** to the extent that the Amended Complaint in the Edgewood Action seeks damages arising from the collapse of the balcony and the amounts paid as "damages, attorney's fees and expenses paid by Edgewood in the Personal Injury Litigation," Amended Complaint at ¶ 92, those damages on their face arise from the same occurrence at issue in the Personal Injury Litigation. MUSIC fully defended Edgewood and Dakota in the Personal Injury Litigation and fully exhausted the $1,000,000 per occurrence limit under the MUSIC Policy. Accordingly, even if MUSIC had any duty to defend Dakota with respect to those allegations and alleged damages, that duty ceased upon the payment of the per-occurrence limit in the settlement of the Personal Injury Litigation. *See* MUSIC Policy Section I.1.a(2) ("Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage[] A").

**Second,** to the extent that the Edgewood Action seeks damages for alleged damage to property, the allegations in the Amended Complaint do not have the potential to trigger coverage because they do not allege that any such damage was caused by Dakota's conduct as a property manager.

As quoted above, the grant of coverage in the MUSIC Policy provides that "[w]e will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies," and that "[w]e will have the right and duty to defend the insured against any 'suit' seeking those damages," but "will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply." It further provides that "[t]his insurance applies to 'bodily injury' and 'property damage' only if [] the 'bodily injury' or 'property damage' is *caused by* an 'occurrence' that takes place in the 'coverage territory.'" MUSIC Policy Section I, Coverage A – 1.b(1) (emphasis supplied).

Based upon the decision in the Declaratory Judgment Action, Dakota would qualify as an insured for purposes of the duty to defend only as to claims based on its status as property manager and therefore, Dakota's entitlement, if any, to a defense under the MUSIC Policy is limited to such claims. The Amended Complaint, however, does not allege that anything Dakota did or failed to do as property manager caused the alleged damage to the property requiring remediation. The allegations against Dakota as property manager are only that its failure to disclose what it knew

8

about the defective construction and unsafe conditions contributed to Edgewood not preventing the accident on June 8, 2019 that led to bodily injuries. As noted above, MUSIC has already fully exhausted the limit of insurance available for any claims of bodily injury from that accident through its settlement of the claims in the Personal Injury Action.

As to any alleged damage to property, the Amended Complaint alleges such damage was caused by the errors and omissions of Community and Dakota – *as property developer*, not as property manager – in the design and construction of the Apartment Complexes. *See, e.g.,* Amended Complaint ¶¶ 25, 28. Dakota does not qualify as an insured under the MUSIC Policy with regard to claims relative to its status as property developer. Accordingly, none of the allegations bring the claims within the MUSIC Policy's potential scope of coverage.

**Third,** any claim by Dakota for coverage under the MUSIC Policy would be barred by the known loss doctrine. Pursuant to the known loss doctrine, Dakota cannot claim insurance coverage for a known event. The Amended Complaint alleges throughout that, as property manager of the Apartment Complexes, Dakota had actual knowledge of the alleged damage to property (*i.e.,* the defective design and construction of the balconies) from at least 2012 through 2018. *See* Amended Complaint at ¶¶ 39-40, 44, 49. Accordingly, even if the claims asserted against Dakota as property manager alleged "property damage" caused by an "occurrence" (which they do not), there is no possibility for coverage under the MUSIC Policy because the Amended Complaint itself alleges that Dakota knew, prior to the MUSIC Policy period, that the alleged damage to property had occurred.

**Fourth,** there is no possibility of coverage under the MUSIC Policy to the extent any "property damage" is alleged in the Edgewood Action because all such alleged property damage is clearly excluded pursuant to **Exclusion j(1)** of the MUSIC Policy.

The MUSIC Policy refers in various places to "you" and "your." It provides that such references are to the Named Insured under the MUSIC Policy: "Throughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." MUSIC Policy CG 00 01 04 13 at page 1 of 16. The Named Insured shown in the Declarations is Edgewood.

**Exclusion j – Damage to Property** provides:

> This insurance does not apply to:
>
> *  *  *
>
> "Property damage" to:
>
> (1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property[.]

9

MUSIC Policy Section I, Coverage A – 2.j(1). Thus, the MUSIC Policy does not apply to "property damage" to property Edgewood owns, including any costs or expenses incurred for repair, replacement, enhancement, restoration or maintenance of property Edgewood owns.

The entire basis of the Amended Complaint in the Edgewood Action is the claim that Edgewood is entitled to recover damages for the alleged property damage to the Apartment Complexes that Edgewood owns, including the costs of remediating such property. Accordingly, based on the plain language of the MUSIC Policy and the allegations in the Amended Complaint, there is no possibility of coverage for any of the claims asserted in the Edgewood Action pursuant to exclusion j(1)

*     *     *

The foregoing is sufficient to demonstrate that there is no possibility of coverage for the claims asserted in the Edgewood Action and, therefore, MUSIC has no duty to defend Dakota in that action. We, nevertheless, also draw the following to your attention.

The Amended Complaint contains a cause of action for fraud and deceit against Dakota under certain North Dakota statutes. *See* Count VII. **Exclusion 2.a—Expected or Intended Injury** provides:

### 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

Based on the allegations in the Amended Complaint, Exclusion 2.a may bar coverage under the MUSIC Policy for the fraud and deceit cause of action.

The only cause of action in the Amended Complaint expressly against Dakota as property manager is Count VIII asserting breach of contract for alleged breach of obligations under the Property Management Agreement between Edgewood and Dakota. **Exclusion 2.b—Contractual liability** provides:

### 2. Exclusions

This insurance does not apply to:

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

10

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

Based on the allegations in the Amended Complaint, Exclusion 2.b may bar coverage under the MUSIC Policy.

The Amended Complaint alleges that Edgewood suffered damages resulting from Dakota's work as a property developer in the design and construction of the Apartment Complexes and that the defective and unsafe balconies have led to costs for remediation as well as diminution in value, lost rent, lost revenue, and lost income. As explained above, "you" and "your" in the MUSIC Policy refer to Edgewood as the Named Insured. But, assuming *arguendo*, that "you" and "your" could be read to encompass Dakota – who is not a Named Insured – coverage under the MUSIC Policy may be barred by operation of the following exclusions:

**Exclusions j(2) ("Premises you sell").**

"Property damage" to:

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**1 – Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m – Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured,

arising out of:

11

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n – Recall Of Products, Work Or Impaired Property.**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

The MUSIC Policy also contains an exclusion added by endorsement that states as follows:

## EXCLUSION – CONTINUOUS, PROGRESSIVE, OR REPEATED

## BODILY INJURY OR PROPERTY DAMAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The following Exclusion is added to Paragraph **2. Exclusions,** of **SECTION I, COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY:**

This insurance does not apply to:

12

"Bodily injury", "property damage" or "personal advertising injury", including any continuous or progressively deteriorating or repeated "bodily injury", "property damage" or "personal advertising injury", that first occurs prior to the inception date of the policy to which this endorsement is attached, regardless of whether such "bodily injury", "property damage" or "personal advertising injury" is alleged to continue during the policy period of the policy to which this endorsement is attached.

This exclusion applies regardless of whether such "bodily injury", "property damage" or "personal advertising injury", including continuous or progressively deteriorating or repeated "bodily injury", "property damage" or "personal advertising injury", is known or unknown by any insured.

The Amended Complaint alleges that damage to property at the Apartment Complexes commenced and progressed from the time of the original construction of the Apartment Complexes. *See* Amended Complaint ¶¶ 28, 39-40, 44, 49. Accordingly, the alleged damage first occurred prior to the inception date of the MUSIC Policy. Based on the allegations in the Amended Complaint, this exclusion may bar coverage under the MUSIC Policy.

\*       \*       \*

We note that MUSIC also issued two other policies to Edgewood: Policy No. MP0081004000259, effective from July 26, 2013 through July 26, 2014, and Policy No. MP0082001001170, effective from July 26, 2019 through July 26, 2020. Those policies contain all of the same coverage provisions and exclusions discussed in this letter with respect to the MUSIC Policy. Although your tender letter only identified the 2018-19 MUSIC Policy, to the extent that you intended to tender Dakota's defense in the Edgewood Action to MUSIC under one or both of the 2013-14 and/or 2019-20 policy, the same analysis set forth herein applies (with the exception of the exhaustion analysis) and MUSIC disclaims coverage under those policies for the claims asserted against Dakota in the Edgewood Action.

\*       \*       \*

For the reasons set forth in this letter, there is no possibility of coverage from MUSIC for the claims in the Edgewood Action. MUSIC, therefore, has no duty to provide Dakota with a defense against or indemnification for those claims and thus rejects the tender of the defense from FUMIC and Dakota.

The foregoing statement of MUSIC's positions with respect to the captioned claims is based on MUSIC's evaluation of the information that MUSIC has obtained to date. This letter is not intended to be, nor is it to be construed as, an exhaustive discussion of all the terms, conditions, provisions or exclusions contained in the MUSIC policies, which might limit or preclude coverage for this matter. There may be other provisions of the policies, though not specifically cited herein, that may limit or preclude coverage for this claim. MUSIC expressly reserves all rights under the MUSIC policies to limit or disclaim coverage on additional or alternative bases if other terms, conditions, exclusions, endorsements, definitions and provisions of the MUSIC policies that are found to be applicable. MUSIC reserves the right to modify, amend, or supplement this coverage analysis based on additional information or changes in the allegations made regarding this matter.

13

MUSIC does not waive its right to rely on the policies in the future to limit or disclaim coverage, and expressly reserves all rights in this regard.

If you have additional information that you believe we should consider, please provide it as soon as possible and we will promptly review it and respond. If you wish to discuss this matter further, please contact me at your convenience.

Sincerely,

Sincerely,

*Greg Shaw*

Greg Shaw
Claims Tech Specialist

14

# EXHIBIT B



**NORTH DAKOTA**
Insurance & Securities

CERTIFIED MAIL

August 1, 2025



RECEIVED

AUG 1 3 2025

Selective Insurance
Corporate Legal Department

Michael Lanza
Mesa Underwriters Specialty Insurance Company
40 Wantage Ave
Branchville, NJ 07890

> Farmers Union Mutual Insurance Company, Plaintiff v. Mesa Underwriters Specialty Insurance Company, Defendant.

To Whom It May Concern:

Enclosed please find the Service of Process for Summons & Complaint for Declaratory Judgment, to Mesa Underwriters Specialty Insurance Company.

Please contact the attorney or plaintiff for any future matters relating to this service.

Sincerely,

Nichole Feldman
Administrative Assistant

Enclosure(s)



600 E Boulevard Ave
Bismarck, ND 58505-0500

phone: (701)328-2440 | fax: (701)328-4880
insurance.nd.gov | insurance@nd.gov

**Jon Godfread, Commissioner**





ZIP 58505 $ 010.04⁰
02 4W
0000378434 AUG-01 2025

9307 1699 0430 0138 0950 34

JON GODFREAD
**COMMISSIONER OF INSURANCE**
STATE OF NORTH DAKOTA
600 East Boulevard Avenue - Dept 401
Bismarck, North Dakota 58505-0320

Michael Lanza
Mesa Underwriters Specialty Insurance Company
40 Wantage Ave
Branchville, NJ 07890